## COURT OF APPEALS,

### Feb. 18, 1908.

# PEOPLE v. CHESTER GILLETTE.

### (191 N. Y. 107.)

(1). MURDER—CIRCUMSTANTIAL EVIDENCE—WEIGHT AND EFFECT THEREOF.

The evidence upon the trial of a defendant, charged with the crime of murdering a woman whom he had seduced and who had become pregnant by him, examined and held, that such evidence, although circumstantial, all taken together and considered as a connected whole, constitutes such convincing proof of the guilt of the defendant that the court is not able to escape from its force by any justifiable process of reasoning, and that not only is the verdict of the jury convicting the defendant of the crime of· murder in the first degree not opposed to the weight of evidence and to the proper inferences to be drawn therefrom, but such verdict is abundantly justified by the evidence.

(2). CONSTITUTIONAL LAW—POWER OF GOVERNOR TO CALL EXTRAORDINARY TERM OF THE SUPREME COURT, UNDER SECTION 234 OF CODE OF CIVIL PROCEDURE—NOT AFFECTED BY CONSTITUTIONAL PROVISION (N. Y. CONST. ART. 6, § 2) EMPOWERING APPELLATE DIVISION TO FIX TERMS OF THE COURT.

The provisions of the Constitution (N. Y. State Const. art. 6, § 2), conferring upon the justices of the Appellate Division of each department the power of appointing terms of the Supreme Court in and for such department, relate to ordinary and usual terms of court and do not in any manner conflict with the power reposed in the governor by. the statute (Code Civ. Pro. § 234) to call extraordinary terms; and, hence, a contention that the trial court, which was held at an extraordinary term convened by the governor for the purpose of trying the defendant, was not organized according to the Constitution of the state and had no jurisdiction to try the defendant or pronounce sentence against him, is untenable.

(3). EVIDENCE—EXHIBIT TO PROVE PREGNANCY OF DECEDENT—WHEN PRESENCE THEREOF IN COURT IS NOT ERRONEOUS AS TENDING TO INFLAME PREJUDICE OF JURY.

The fact that the fœtus taken from decedent's body at the time

of the autopsy was produced in court upon the trial of said defendant, in order to establish that the decedent was pregnant, does not constitute error, where such exhibit was carefully covered up and kept from view of the jury, so that it could not by any possibllity have served to inflame their feelings to the prejudice of the defendant, and, especially, where no fact was established by such exhibit which was not, in the end, fully admitted by the defendant.

(4). EVIDENCE—THE FACT THAT LETTERS, ADMITTED AS EVIDENCE OF RELATIONS BETWEEN DEFENDENT AND DECEDENT, MAY HAVE HAD INFLUENCE UPON MINDS OF THE JURY ON QUESTION OF MOTIVE, FOR WHICH THEY MIGHT ALSO HAVE BEEN ADMITTED, IS NOT GROUND FOR REVERSAL OF JUDGMENT OF CONVICTION.

Where letters, written to the defendant by the decedent and by the defendant to the decedent, were admitted by the trial court not only under the ruling that the former should not be received as evidence of the facts therein stated but under the further, and too narrow, ruling that they were admitted " only for the purpose of showing how the decedent regarded her relations with the defendant," the judgment of conviction should not be reversed upon the ground that the letters might have had a wider significance in the minds of the jury than that which was authorized by the trial judge, where, aside from the admitted purpose of showing the relations and thoughts of the decedent towards the defendant, the only effect the letters would have been apt to have with the jury, so far as the latter could be controlled by any ruling of the court, would have been to tend to establish a motive for the commission by defendant of the crime which is charged against him; the letters might have been admitted with entire propriety for this very purpose, and, therefore, if the jury considered them upon that feature of the People's case, it did no more than the court should have directed and authorized them to do.

(5.) DISTRICT ATTORNEY—ERRONEOUS STATEMENTS ON SUMMING UP— WHEN HARMLESS OR CURED BY WITHDRAWAL THEREOF AND BY INSTRUCTIONS FROM THE COURT THAT THEY BE DISREGARDED.

The fact that the district attorney, in summing up the case, after a long and bitterly contested trial, made some statements not fully justified by the evidence held not to be a sufficient ground for reversal where the district attorney, upon objection, immediately withdrew, and the trial judge explicitly and clearly instructed the jury to disregard, any unwarranted statements, and it does not

appear that such statements produced any substantial or lasting effect upon the jury outside of and in addition to that caused by the evidence itself.

Appeal from a judgment of the Supreme Court, rendered December 10, 1906, at an Extraordinary Trial Term for the county of Herkimer, upon a verdict convicting the defendant of the crime of murder in the first degree, and from an order denying a motion for a new trial.

The facts, so far as material, are stated in the opinion

*Albert M. Mills* and *Charles D. Thomas* for appellant. It was error to receive in evidence and to read to the jury the letters of the deceased which she had written to the defendant. (*Willett* v. *People*, 27 Hun, 477; 92 N. Y. 29; *People* v. *Green*, 1 Park. Cr. Rep. 18; Wigmore on Ev. § 1073; *People* v. *Smith*, 172 N. Y. 232; *People* v. *Sutherland*, 154 N. Y. 347; *People* v. *Webster*, 139 N. Y. 81.) It was error to permit the witness Marjorie Carey to express an opinion that a certain sound which she heard was uttered by a woman. (*Ferguson* v. *Hubbell*, 97 N. Y. 507; *Schultz* v. *U. Ry. Co.*, 181 N. Y. 37; *Littlejohn* v. *Shaw*, 159 N. Y. 188; *Roberts* v. *N. Y. & E. R. R. Co.*, 128 N. Y. 465; *Messner* v. *People*, 45 N. Y. 1.) It was error to submit the two specimens of hair to the jury and let them speculate as to the identity thereof. (*Petrie* v. *Howe*, 4 T. & C. 85; *People* v. *Carney*, 29 Hun, 49.) It was error to produce the uterus of the deceased and the fœtus of the unborn child and receive them in evidence. (*Perry* v. *M. R. R. Co.*, 68 App Div. 353; *People* v. *Altman*, 147 N. Y. 473; *People* v. *Strait*, 154 N. Y. 165.) The method by which this trial was conducted by the prosecution was oppressive and unfair to the defendant. (*People* v. *Fielding*, 158 N. Y. 546; *People* v. *Smith*, 162 N. Y. 531; *People* v. *Wolf*, 183 N. Y. 464.) The court which held this trial was not organized according to the Constitution of the state, and had no jurisdiction or power to try the defendant or

pronounce the judgment of death against him. (Const. of N. Y., art. 6, § 2.)

*George W. Ward* for respondent. It was not error to receive in evidence the complete correspondence passing between the deceased and the defendant during their relationship. (*People v. Sutherland,* 154 N. Y. 345; *People v. Tice,* 131 N. Y. 651.) The description by the witness Carey of the cry heard by her about six o'clock P. M. of July eleventh, was competent. (Abb. Tr. Brief, 228; 3 Wigmore on Ev. §§ 1918, 1919; *Cornell v. Green,* 10 S. & R. 16; *Mayor, etc., v. Pence,* 24 Wend. 675; *Syddleman v. Beckwith,* 43 Conn. 12; *Hardy v. Merrill,* 56 N. H. 241; *Van Wycklen v. City of Brooklyn,* 118 N. Y. 429; *Schwander v. Birge,* 46 Hun, 69; *Ferguson v. Hubbell,* 97 N. Y. 513; *Cowen v. Hayes,* 138 Mass. 185; *People v. Ward,* 3 N. Y. Cr. Rep. 483; *People v. Adams,* 63 N. Y. 621.) No error was committed in exhibiting to the jury the tangled hair collected from the braces of the boat together with some hair cut from decedent's head. (*People v. Buddensieck,* 103 N. Y. 487.) The power of the governor to call an extraordinary term of court and the jurisdiction of the court is not questionable. (Code Civ. Pro. § 234; *People v. Shay,* 147 N. Y. 85; *People v. Young,* 18 App. Div. 162.)

HISCOCK, J. No controversy throws the shadow of any doubt or speculation around the primary fact that about six o'clock in the afternoon of July 11, 1906, while she was alone with the defendant, Grace Brown met an unnatural death and her body sank to the bottom of Big Moose lake. But the question which is bitterly disputed, and which is of such supreme importance to this defendant, is whether this tragedy was the result of suicidal drowning or of violence inflicted by his hand under such circumstances as constituted deliberate murder. The jury, after a long and arduous trial, have adopted the latter theory, and, therefore, the serious responsibility comes to us of determin-

ing whether their conclusion is infected with any such error, either of fact or of law, as requires the judgment based thereon to be reversed and the defendant to be relieved from that sentence to the extreme penalty of the law which now hangs over him.

In pursuing the first branch of our investigation and in the discussion of the evidence for the purpose of making clear and stating our conclusions with reference to its weight and effect, it will not be possible to refer to all the details which have been developed with such care by counsel on either side in support of his theory of guilt or innocence. All of them have received our painstaking consideration and the omission of reference to many of them is due to those limitations of reasonable length which should be imposed upon this opinion.

At the date of her death Grace Brown was about twenty years of age and the defendant was about three years her senior. The former had been brought up in a country home of an apparently simple and wholesome atmosphere, and, subject only to her relations with the defendant, she seems to have been a girl of pure character and of unusual intelligence and attractiveness. The defendant was possessed of education, of previous good character, and had had considerable experience in the world. They came together as employees in the factory of defendant's uncle in the city of Cortland, New York, and this common employment led to acquaintance and intimacy, and finally to the seduction, and three or four months before her death to the pregnancy of the deceased by the defendant. The defendant largely screened this association from observation, and in public sought the society of young ladies belonging to what would be regarded as a more pretentious social grade than that to which decedent belonged.

In the latter part of June, evidently by pre-arrangement and with the expectation that the defendant soon would join her, the deceased left the factory and went to her father's home not far

from Cortland. While there several letters passed from her to him and two or three from him to her. The great body of the former is filled with expressions of affection for defendant and with pathetic references to her physical and still greater mental distress caused by her condition; with references to their coming trip and what manifestly were preparations for marriage; with complaints at defendant's lack of affection and consideration and his pursuit of pleasure elsewhere and his failure to write to her more frequently; with entreaties that he should soon come to her, and doubts whether he would come as he had promised, followed by expressions of contrite sorrow for her distrust of him; and finally with very significant statements that if he did not come to her she would return to him at Cortland.

Finally on the evening of July 8th the defendant went to a neighboring railroad station where the next morning he was joined by the deceased; thence they journeyed to Utica where they stayed that night; thence the next morning to Tupper lake in the Adirondacks where they stayed that night, the next morning retracing their course to Big Moose lake, and thus reaching the spot where was to be enacted the closing scene of their unhappy association. This journey must have been planned with the theory, genuine of course on the part of the woman, that it would lead to marriage. It could have presented no other reasonable or lawful purpose. The time had passed when desire would prompt such a trip as the cover or opportunity for mere illicit enjoyment. A condition existed which only could be relieved in a legitimate way by marriage and the defendant has testified that at that time he loved the deceased and intended to marry her.

Yet every significant step taken by him seems to have led away from this consummation. At all times when he was in the neighborhood or presence of those who knew him he concealed his companionship with the deceased, and at Utica and Tupper lake where he stayed with her as his wife he registered

both under assumed names and from fictitious residences, and the final registry made at Big Moose lake which gave correctly the name and residence of the deceased, still utilized a false name and place of residence for himself. And while he was thus carefully suppressing the facts of identity and companionship he was arranging through social engagements with young lady acquaintances and otherwise to be present a few days later at certain pleasure resorts, publicly and undisguised.

From these circumstances, the People argue with much force that at the time when defendant started out on the journey he did not intend to marry the deceased; that he did not purpose during the latter days of the week openly to acknowledge a relationship which he was so carefully concealing during the first days, and that, therefore, already he must have planned to rid himself of its embarrassments. At least it is manifest that during those days when they journeyed back and forth he was unready and unwilling to solve their difficulties by the lawful remedy of marriage.

Shortly after arrival at Big Moose the defendant engaged a row boat and alone with the decedent started out on the lake. Some of the incidents which attended the setting out on this trip are treated as of great importance by the district attorney and we think properly so. While an article of decedent's wearing apparel was left in a conspicuous place in the hotel from which they started, defendant gathered up and took with him all of his property, including an umbrella, an overcoat and a heavy suit case upon which he carried a tennis racket which became an article of much importance on the trial. We do not think that the evidence fairly establishes any legitimate explanation of this latter conduct and we are forced to the conclusion urged by the People that the defendant was then planning such a termination of the boat ride that he would not desire to return to the hotel and, therefore, was taking with him all his possessions.

The two people were seen on the lake at various times during the afternoon and finally towards its close were observed going toward a secluded portion of the lake where subsequently the tragedy occurred, the defendant rowing and the decedent sitting in the stern of the boat, and soon after and at about the time when death was happening a sound was heard which was described as a woman's scream.

After the death the defendant went on shore and taking his possessions with him struck through the woods to a road with which it is claimed he had become familiar and journeyed on foot and by steamboat to another resort of the Adirondacks near that at which as before stated he had planned to be the last of the week. As he went, he carefully hid his tennis racket in the woods He became a guest of the hotel under his own name and there and in the neighborhood spent the following two days after the manner of an ordinary summer tourist, showing no outward signs of distress and giving no information of what had happened. Upon the following morning he was taken into custody.

The next day after the tragedy the boat was found floating bottom side up and the body of the decedent was recovered from the lake.

Of the facts thus far stated most are undisputed and all are established in our judgment beyond any reasonable doubt whatever. And now with the light which they shed upon it we will revert to the crucial question, What was the cause of Grace Brown's death? and that leads us to an examination of the condition of her body as it was disclosed by the autopsy performed July 14th by five physicians who were sworn as witnesses.

According to their testimony there were found on her head and face many marks of violence, especially there being evidence of a blow near the left eye sufficient to cause blindness and of a blow on the side of the head three inches above the

ear of sufficient severity to cause unconsciousness even if not more serious consequences, and it is the theory of the prosecution that these wounds were inflicted by the defendant in the boat with the tennis racket and thereafter the body thrown into the water.

The accuracy and completeness of this autopsy and the candor and truthfulness of these doctors were assailed with unflinching vigor and with much ability on the trial by the learned counsel for the defendant. He sought to minimize the evidence of violence and to make the witnesses admit that there were present all of the prominent signs of drowning, thus combating the People's theory and sustaining the defendant's theory of suicide. We think that he failed of success. It may be admitted that at times on cross-examination the answers of witnesses were unsatisfactory and that in the form in which questions were put they were compelled to admit the presence of signs incident to drowning; this latter evidence many times when occasion offered being modified to the effect that such signs as were actually found in this body might result from death in other ways or from the embalming which had been performed. But aside from this, through the examination of these witnesses as an entirety, there runs constant, consistent and convincing evidence that the decedent bore upon her head the marks of violent blows. In the statement compiled from the notes of the autopsy within sixteen days after the death and before witnesses, even if they were willing, could intelligently prepare for this trial, we find this concluding statement: " From the findings of the autopsy the cause of death was primarily concussion, followed by syncope and then asphyxiation. "

This testimony to the presence of marks of violence is no expression of opinion or theory. It deals with actual, visible conditions. The witnesses either saw what they describe or else with wholesale and wicked perjury they are attempting to sacrifice a human life by pretending to describe that which

they did not see. We cannot adopt the latter view, and when we reject it and reach the conclusion that the body bore proof of external wounds, we are led directly and irresistibly to the next conclusion as to the authorship of those wounds. No reasonable theory sustains the possibility of their infliction after death, and no reasonable theory accounts for their infliction before death save by the hand of the defendant.

And again, when we reach this second conclusion, we are necessarily driven to the third and last one. If in those final moments whose events were seen by no living eye save that of the defendant himself, he was beating the head of Grace Brown, there is no room for conjecture about the quality and intent of his acts, and it becomes a matter of small consequence whether he thus wounded her to insensibility or worse, or whether he flung her still partly conscious into the water, there for a brief period to maintain a feeble struggle for life and thus produce those signs of drowning whose presence is so earnestly asserted by counsel.

Thus far we have tested the People's case almost entirely by the weight of their own evidence. But limited as we are to a choice between two theories of the decedent's death, the one advanced by the People is strengthened in our minds, if that were necessary, by the improbability and apparent untruthfulness of the one offered by the defendant, and to a consideration of which we now turn.

He testifies that shortly before her death he and the decedent commenced a discussion of their situation, and after awhile he said in substance that he would communicate it to her parents; that they could not keep on as they were, and that thereupon she stated, " Well, I will end it here, " and jumped into the lake; that after some ineffectual efforts to rescue her, and without any cry for help he went on shore and gathering up his property and without informing any of the cottagers or hotel guests on the lake of the accident, he proceeded to Eagle Bay

and Arrowhead, as already stated, where he spent two days in various amusements, still giving no information of what had happened. So that by this evidence, offered by the defendant himself as the only innocent explanation of what transpired, we see him emerging from this catastrophe where he had made no outcry for help, and with apparent composure turning in other directions and to other pursuits while he left the body of the woman, whom he says he loved better than any one else and intended to marry, lying unrecovered and unsought at the bottom of the lake.

And when we have passed beyond the impressive unnaturalness of some of the principal features of his account, we encounter much evidence which still further impeaches its truthfulness. According to the People's witnesses there were several, and, by the admission of the defendant himself, some statements with reference to the tragedy made by him after his apprehension widely at variance with his present testimony. There was no satisfactory explanation of the dry condition of the suit case which he had taken in the boat, or of the condition of his clothes, or of the completely overturned boat with the decedent's cape lying on top of it. And in addition to these inherent deficiencies and improbabilities of his evidence there are repeated contradictions by a large number of witnesses who apparently had no interest in telling anything but the truth.

While incomplete in respect to minor details this summary of the evidence is sufficient for the purposes of this opinion, and as a basis for the statement of our convictions with respect to the merits of the prosecution.

We are mindful at every step that this is a case of circumstantial evidence and that the only eye-witness denies that death was the result of crime. But in obedience to the most exacting requirements of that manner of proof, the counsel for the People, with very unusual thoroughness and ability, has investigated and presented evidence of a great number of cir-

cumstances for the purpose of truly solving the question of the defendant's guilty or innocence. We might think that the proof of some of these facts standing by themselves was subject to doubt by reason of unsatisfactory or contradictory evidence and that other occurrences might be so explained or interpreted as to be reconcilable with innocence. But all taken together and considered as a connected whole, they make such convincing proof of guilt that we are not able to escape from its force by any justifiable process of reasoning, and we are compelled to say that not only is the verdict not opposed to the weight of evidence and to the proper inferences to be drawn from it, but that it is abundantly justified thereby.

But it is earnestly urged that material errors were committed in respect to, and upon, the trial whereby substantial rights of the accused were so prejudiced that for this reason he should be granted another opportunity to establish his innocence, and we take up the consideration of these arguments.

At the very threshold of the trial the defendant challenged the legality of the term at which he was being tried, and which was an extraordinary term convened by the governor for the purposes of this particular trial. It is insisted that under the provisions of section 2, article VI of the Constitution the exclusive power was conferred upon the Appellate Division of appointing terms of the Supreme Court and that the power conferred by section 234 of the Code of Civil Procedure upon the governor to convene extraordinary terms has been impliedly repealed. We think that this question indirectly and directly has been decided adversely to appellant's contention, and we have no disposition to disagree with the conclusion sustained and reached in *People* v. *Young* (18 App. Div. 162) and *People* v. *Shea* (147 N. Y. 78), that the constitutional provisions cited relate to ordinary and usual terms of court, and do not in any manner conflict with the power reposed in the governor to call extraordinary terms.

Some of the exceptions, such as those relating to the photograph of the deceased used upon the trial, the identity of the hair found at the bottom of the boat, and the evidence of the hearing of that which sounded like a woman's scream at about the time of and from the direction of the locality where the decedent's death occurred, do not require detailed consideration, for in our opinion the evidence received was competent and simply presented the ordinary questions of weight and credibility.

No error was committed by the production in court of the foetus taken from decedent's body at the time of the autopsy. We are not prepared to say that it would have been error if this had been produced and put in evidence in the ordinary way. It was a very material part of the People's case to establish that the deceased was pregnant, and up to the time the evidence in question was produced there had been no act or admission upon the part of the defendant which relieved them from establishing this fact by any competent evidence, and it very well might be said that the foetus itself would be perfectly proper testimony upon this point. But it is not necessary to go to this extent in order to meet the criticisms of the appellant, for this exhibit was carefully covered up and fully kept from the view of the jury. It, therefore, not only established no fact which was not in the end fully admitted in behalf of the defendant, but it could not by any possibility have served to inflame the feeling of the jury to his prejudice.

The only question of evidence which in our judgment is at all debatable is that which arises in connection with the admission in evidence of decedent's letters to the defendant.

In addition to those written in June, and to which already reference has been made, two others written by her to defendant and one written by defendant to her during the month of April preceding the homicide were admitted in evidence and are criticised. So far as these earlier letters are concerned,

they constitute a well-proportioned correspondence between the parties, those of the decedent largely being taken up with girlish gossip and with expressions of endearment and affection for the defendant, which were not harmful to him. The only material passages are those in her first letter calling for his companionship and somewhat reproaching him for his willingness to have her absent, and the significant reply in his that it would be better to discontinue his attentions.

The only possible complication in connection with the admission of these letters arises from the restriction placed by the learned trial justice upon the purpose for which they might be admitted. Of course it was entirely correct to rule that they should not be received as evidence of the facts therein stated, but the further ruling that they should be admitted " only for the purpose of showing how the decedent regarded her relations with the defendant," made in a spirit of commendable caution, placed a limitation on their use which was too narrow and somewhat difficult to interpret. Independent of the competency secured for decedent's letters by reason of the fact that they were part of a correspondence which included letters from defendant also introduced in evidence, her letters were perfectly proper evidence upon the subject of motive. They forced upon his mind, after he had proposed a termination of their intimacy, a vivid realization of the fact that the decedent, distressed in body and agonized in mind as the result of his acts, was clinging to him and was looking to marriage as the only solution of her difficulties, and that while pleading that he should come to her, she was intimating at the same time in no uncertain terms that if he did not keep faith and come to her she would come to him to accomplish this. They must have suggested with irresistible force that he had arrived at a point where unless he was willing to publicly acknowledge his relations with the decedent as he never had done and permanently cement them by marriage he must escape by another way lead-

ing in a different direction and, as the People say, to the tragedy at Big Moose lake.

Both counsel by their reference to and use of these letters, without available objection made at the time, perhaps placed a practical construction on the ruling of the court which broadened the natural meaning of the language used and materially enlarged the purposes for which the letters might be considered by the jury under the ruling. In addition to this, the district attorney by his cross-examination of the defendant with reference to these same letters legitimately brought into the record a large part of the contents thereof free from th restrictions originally imposed by the trial judge.

But notwithstanding all this, it possibly may be true that these letters obtained a wider significance in the minds of the jury than that which was authorized by the trial judge, and the question is whether for this reason we should reverse the judgment.

Aside from the permitted purpose of showing the relations and thoughts of the decedent towards the defendant, we can think of no effect which they would have been apt to have with the jury, so far as the latter could be controlled by any ruling of the court, except to tend to establish a motive for the commission by defendant of the crime which is charged against him. But, as we have seen, they might have been admitted with entire propriety for this very purpose, and, therefore, if the jury considered them upon that branch of the People's case, it did no more than the court should have authorized and directed them to do. Should we, therefore, reverse this judgment because the jury may have considered evidence for a purpose not permitted by the court on the trial but which should have been permitted and for which purpose under our opinion the court would permit it to be used on a new trial if we should grant one? We think not. We are commanded by the statute to give judgment " without regard to technical errors or

defects or to exceptions which do not affect the substantial rights of the parties." and we should depart from the letter and spirit of these controlling instructions if we did so reverse.

It is true that scattered here and there through the letters are expressions which are not very pertinent. But in the main these relate to little details of the decedent's life and we think could not have been a source of material harm to the defendant. Furthermore we are inclined to think that when counsel had made objection to the letters as a whole as incompetent and inadmissible the obligation fairly rested upon him to specify any scattered sentences which he deemed inadmissible for special reasons.

In the submission of the case of the jury we do not find that any errors were committed in the very careful and impartial charge of the court, and so far as the later stages of the trial are concerned we shall limit our discussion to a review of the complaints made against the methods of the district attorney in summing up, it being claimed that he made statements and comments which were not justified by the record and which tended greatly to excite the minds of the jury and prejudice the defendant.

It doubtless is true that the district attorney as well as his adversary did say some things which rested upon no sufficient basis of evidence. Many of his statements, however, which are now criticised come within the fair limits of inferences from and arguments on the testimony. We think that at least one statement in regard to the alleged comments of defendant's counsel upon the decedent must have been the result of a mistake and inadvertence, or else, as now claimed by the district attorney, based on something not appearing in the record. While, of course, it is objectionable that counsel in summing up should travel beyond correct limits, we realize that human nature has limitations and that it is difficult for counsel, who for weeks have been engaged in such a struggle as was this

case, tending to arouse to the uttermost degree the zeal and anxiety, at all times to avoid transgression. Neither side was entirely free from it here. But, upon objection, the district attorney immediately withdrew, and the trial judge explicitly and clearly instructed the jury to disregard, any unwarranted statements, and we do not believe that they produced any substantial or lasting effect upon the jury outside of and in addition to that caused by the evidence itself.

In conclusion, we think that no error was committed which substantially impaired defendant's rights. We believe that the adverse verdict was not the result of any of those occurrences which are criticized by his counsel and which possibly we could say might better be modified or omitted on another trial. But rather we think that it was based on the substantial features and essential character of the case which was fairly established against him, and that so long as the conduct of an accused is to be tested in such an investigation as this, by the intentions and purposes which ordinarily prompt human acts, and by the consequences which ordinarily follow them, no other result reasonably could have been expected in this case than that which has overtaken the defendant.

The judgment of conviction should be affirmed.

CULLEN, Ch.J., GRAY, VANN, WERNER, WILLARD BARTLETT and CHASE, JJ., concur.

Judgment of conviction affirmed.