William C. Hecht, J.
Defendants move under rule 106 of the Rules of Civil Practice to dismiss each of the four causes of action for insufficiency. The complaint is based upon a telecast of ‘ ‘ The Stork Club Show ’ ’ over a nationwide network of stations and facilities, including Station WABC-TV. Defendant Stork operates “ The Stork Club ”, defendant Mayfair prepared and produced ' ‘ The Stork Club Show ’ ’, defendant American Broadcasting telecast the show, and defendant Billingsley acted as a performer and master of ceremonies on the show.
Plaintiff earns his livelihood as the operator and manager of “ The Toots Shor Restaurant ”, with which the Stork Club competes.
During the show, the following conversation was telecast between Billingsley and one Brisson, a guest on the program, and plaintiff’s picture was telecast in connection therewith:
Mb. Billingsley : “ I see, I would like to show you a few pictures taken here lately. The first — now, how did this picture get in here ? ’ ’
Mb. Brisson : “ That is Toots Shor and a man I don’t know.”
Mb. Billingsley: “ You want to know something? ”
Mr. Bbisson : “ Want to know something? I saw Toots Shor, he’s a good-looking fellow, isn’t he? ”
Mb. Billingsley: “ Yes, he is. Want to know something? I wish I had as much money as he owes.”
Mb. Bbisson: “ Owes you or somebody else? ”
Mb. Billingsley: “ Everybody — oh, a lot of people.”
Mb. Bbisson : “ He doesn’t owe me anything, but he is a good-looking fellow just the same. A little (indicating) — you know. ’ ’
Mb. Billingsley: “ I wish I could agree with you.”
Three causes of action for defamation are pleaded. All allege that the statements so telecast and the innuendoes necessarily implicit therein were false, which defendants knew or should have known, that they were uttered with malice and for the express purpose of injuring plaintiff in his business. The second cause of action adds the allegation that the statements were read by Billingsley from a prepared script or notes. The third adds the allegation that a permanent sound and motion picture film recording was made of the telecast, which recording was exhibited at various times to various individuals.
The fourth cause of action alleges that plaintiff’s name and picture were used without his consent as a part of the program; *859 that this was done for the purpose of increasing the value of the program to sponsors and to telecasters, of enhancing the reputation and commercial value of Billingsley as a performer, for the purpose of advertising “ The Stork Club ” and increasing its trade at the expense of plaintiff, its competitor.
Defendants contend that there is nothing defamatory in the portion of the dialogue complained of. Their argument runs: “ Such a statement can hardly be considered defamatory or even inconsistent with our economic society which is fundamentally based upon credit. There is hardly an individual today who does not temporarily owe money and usually, the more solvent an individual, the greater is his or her capacity for credit. It would be no idle remark to wish that one had as much money as some of our 20th century financial wizards would owe on any given date.”
Defendants may be able to convince a jury that their language should be given such an innocuous connotation. But I will not hold as matter of law that the jury must reach such conclusion. Accordingly, the motion is denied as to the second cause of action (Hartmann v. Winchell, 296 N. Y. 296) and as to the third cause of action (Brown v. Paramount Publix Corp., 240 App. Div. 520; Ostrowe v. Lee, 256 N. Y. 36). That leaves for consideration the real problem in the case — whether the first cause of action based upon a telecast not read from a prepared script sounds in libel or in slander.
This precise question has not been passed upon by our appellate courts, nor apparently in any other jurisdiction. Hartmann v. Winchell (supra, p. 298), held that the “ utterance of defamatory remarks, read from a script into a radio microphone and broadcast, constitute[s] publication of libel ” (italics supplied). It expressly did not reach the question “ whether broadcasting-defamatory matter which has not been reduced to writing should be held to be libelous because of the potentially harmful and widespread effects of such defamation.” (P. 300.) Fitld, J., concurring, held that it should ‘1 because of the likelihood of aggravated injury inherent in such broadcasting ” (p. 301).
Sorensen v. Wood (123 Neb. 348, 353), Charles Parker Co. v. Silver City Crystal Co. (142 Conn. 605, 610-612) and Weglein v. Golder (317 Pa. 437, 438-439) likewise hold libelous radio broadcasts read from a written script; Meldrum v. Australian Broadcasting Co. Ltd., [1932] Vict. L. R 425, to the contrary, was specifically rejected in Hartmann v. Winchell (supra). The other cases in the field do not squarely bear on this subject, one affirming a verdict for defendant on the ground that the broadcast was not defamatory (Singler v. Journal Co., 218 Wis. *860 263, 268-269); another affirming a verdict for defendant on the ground that the broadcast was privileged (Irwin v. Ashurst, 158 Ore. 61, 66-67); and others determining the issue of the broadcasting company’s liability for ad lib. remarks interpolated by the performer (Summit Hotel Co. v. National Broadcasting Co., 336 Pa. 182, 184-201; Josephson v. Knickerbocker Broadcasting Co., 179 Misc. 787, 788); for written remarks which it had not seen in advance (Kelly v. Hoffman, 137 N. J. L. 695, 699-702; Sorensen v. Wood, p. 357, supra).
In Tex Smith, Inc., v. Godfrey (198 Misc. 1006) Stetjer, J., held that the words used in the telecast tended to injure plaintiffs in their business; that therefore it whs unnecessary to determine whether the action sounded in libel or slander. (See to the same effect, Miles v. Louis Wamser, Inc., 172 Wash. 466.)
In Locke v. Gibbons (164 Misc. 877) Pecora, J., after reviewing numerous authorities and law review articles, dismissed a complaint based upon interpolations made by defendant in a radio broadcast, upon the ground that the action was in slander and the remarks were not slanderous per se. He said' (pp. 880-881):
“ However, our courts cannot legislate to eradicate the long-established distinction between libel and slander * * *
“It is manifest that not only should the ‘ mischief ’ aspect of the distinction between libel and slander be considered, but the element of ‘ permanence of form ’ as well. Libel has always been considered as written, and slander as spoken, defamation. (Pollock, Law of Torts [13th ed. 1929], p. 242; Odgers, Libel and Slander [6th ed. 1921], pp. 6, 7.) The broadcasting over the radio of an extemporaneous speech is no different in principle from the delivery of the same speech over an amplifier to a vast audience in a stadium. Both methods involve use of the spoken word, and if the utterances are defamatory they may be equally damaging in nature. The extent of the damage might obviously depend upon the number of persons hearing the defamation in either case.” This order was affirmed by the First Department without opinion (253 App. Div. 887). However, the report says: “ See, also, Locke v. Benton & Bowles, 253 App. Div. 369 ” reversing 165 Misc. 631. In that case the court dismissed a complaint by the same plaintiff based upon the same broadcast but against the company presenting the broadcast (Gibbons being its employee). The ground of the dismissal was that “ Neither the script as actually written nor the broadcast as delivered is set forth. In libel and slander it is necessary that the words complained of, whether written or spoken, be set forth in the complaint ” (p. 370). This was an *861 additional ground for dismissal given by Pecora, J. (Locke v. Gibbons, 164 Misc. 877, 881, supra), and was urged in respondent’s brief in the Appellate Division. Under these circumstances, the affirmance without opinion does not necessarily indicate approval of the reasoning of the Special Term which has been quoted above.
The matter being an open one, I am inclined to follow the compelling logic of Fuld, J., in his concurring opinion in Hartmann v. Winchell (296 N. Y. 296, 304, supra), where he said:
“ If considerations of principle are to control, there is no valid reason why the same consequences should not attach to publication through the medium of radio broadcasting as flow from publication through the medium of writing.
“ The primary reason assigned by the courts from time to time to justify the imposition of broader liability for libel than for slander has been the greater capacity for harm that a writing is assumed to have because of the wide range of dissemination consequent upon its permanence in form. (See Pollard v. Lyon, 91 U. S. 225, 235; Ratcliffe v. Evans, [1892] 2 Q. B. 524, 530; see, also, Gratley on Libel and Slander, pp. 3-4.) When account is taken of the vast and farflung audience reached by radio today — often far greater in number than the readers of the largest metropolitan newspaper (cf. Seelman on The Law of Libel and Slander, p. 3) — it is evident that the broadcast of scandalous utterances is in general as potentially harmful to the defamed person’s reputation as a publication by writing. That defamation by radio, in the absence of a script or transcription, lacks the measure of durability possessed by written libel, in nowise lessens its capacity for harm. Since the element of damage is, historically, the basis of the common-law action for defamation (see Jones v. Jones, supra, p. 500), and since it is as reasonable to presume damage from the nature of the medium employed when a slander is broadcast by radio as when published by writing, both logic and policy point the conclusion that defamation by radio should be actionable per se. (See e.g., Restatement, Torts, § 568, subd. [3]; Void, The Basis for Liability for Defamation by Radio, 19 Minn. L. Rev. 611, 639 et seq.; Finlay, Defamation by Radio, 19 Can. B. Rev. 353.) ”
As was stated by Seelman on the Law of Libel and Slander (p. 3, § 7): “ when he [the speaker over the radio] speaks, it is the voice which scatters his words to millions. He speaks with prepared deliberation; and to a vast, if an uncountable, audience. To them his words, are still unrecorded. Even here the words, eagerly awaited with radio acquisitiveness, may leave a record as permanent as if the eye had seen the printed page. *862 The rules of libel and not slander should here apply.” In “ Defamation by Radio: A Reconsideration ”, by Donnelly (34 Iowa L. Rev. 12, 17-18) we find the following (footnotes omitted): “ The development of printing and its possibilities for harm, albeit of a different type, prompted a new conception of liability based on form alone. Another development — the radio — evokes a rejection of formal distinctions. There is no valid reason why the same consequences should not attach to publication through the medium of radio broadcasting as flow from the publication through the medium of writing. The primary reason assigned by the courts from time to time to justify the imposition of broader liability for libel than for slander has been the greater capacity for harm that a writing is assumed to have because of the wide range of dissemination made possible by its permanency of form. When account is taken of the vast and far flung audience reached by radio, it is clear that the broadcast of defamatory utterances are as potentially harmful to the defamed person’s reputation as a publication by writing. Radio makes available to the defamer a simultaneous audience far greater than that reached by the most permanent of writings. The distinction of permanence between radio and newspaper dissemination seems comparatively irrelevant considered from the standpoint of ultimate distribution of the defamatory material.”
This view is supported by the leading English authority. In Gfatley on Libel and Slander (4th ed.), he says (pp. 4-5): “ One reason often given for the distinction is that a libel written and published shows more deliberate malignity than a mere oral slander. £ Written slander,’ said Bayley, J., in Clement v. Chivis [9B & 0, at p. 174] £ is premeditated, and shows design.’ Another reason is that a greater degree of mischief is probable in the case of a libel, owing to its more durable character, and the fact that it can be more easily disseminated. £ A person, ’ said Bowen L. J. in Ratcliffe v. Evans [ (1892) 2 Q. B. at p. 530] £ who publishes defamatory matter on paper or in print puts into circulation that which is more permanent and more easily transmissible than oral slander.’ * * *
‘ ‘ Broadcasting. The reason for the distinction between libel and slander stated above has been completely destroyed by the modern systems of broadcasting by which defamatory words uttered by one person may be disseminated over the whole world: 1 A defamtory statement transmitted over the radio in a broadcast, reaching as it may an audience of many millions, is calculated to cause as much, if not more, damage than a written report in a newspaper, however large its circulation.’
*863 ‘ ‘ By the Defamation Act, 1952, it is provided that, for the purposes of the law of libel and slander, the broadcasting of words for general reception by means of wireless telegraphy shall be treated as publication in permanent form, that is to say, as libel.”
It is true that ‘1 the delivery of the same speech over an amplifier to a vast audience in a stadium ” would still be treated as a slander despite the fact that it may cause infinitely more damage than a writing seen by few (Locke v. Gibbons, 164 Misc. 877, 880, supra). But such a speech falls so inescapably within the conventional definition of slander that in the foregoing situation ‘ ‘ Abolition of the line between libel and slander would * * * be too extreme a break with the past to be achieved without legislation ” (Fuld, J., concurring in Hartmann v. Winchell, 296 N. Y. 296, 303, supra). But it does not follow that a court is equally powerless when dealing with the new media of radio and television.
Defendants cite the words of Judge Cardozo in Ostrowe v. Lee (256 N. Y. 36, supra). In that case the court sustained a complaint in libel based upon defendant’s dictating a defamatory letter to his stenographer, and that she ‘ ‘ in obedience to his orders, read the notes and transcribed them ” (p. 38). The court said (p. 39):
“ Very often a stenographer does not grasp the meaning of dictated words till the dictation is over and the symbols have been read. * * * The author who directs his copyist to read, has displayed the writing to the reader as truly and effectively as if he had copied it himself.
“ To hold otherwise is to lose sight of history and origins. The schism in the law of defamation between the older wrong of slander and the newer one of libel is not the product of mere accident * * *. It has its genesis in evils which the years have not erased. Many things that are defamatory may be said with impunity through the medium of speech. Not so, however, when speech is caught upon the wing and transmuted into print. What gives the sting to the writing is its permanence of form. The spoken word dissolves, but the written one abides and ‘ perpetuates the scandal. ’ ’ ’
Mr. Justice Pecoba leaned heavily on the penultimate sentence in Locke v. Gibbons (supra). The prevailing opinion in Hartmann v. Winchell (supra) likewise cites that sentence, but as authority for its holding that the defamation read from a written script is libel rather than slander, regardless of whether or not the writing is seen by the hearer, because “ What gives the sting to the writing is its permanence of form ” (p. 300). *864 This is immediately followed by the statement already quoted, that the court was not deciding “ whether broadcasting defamatory matter which has not been reduced to writing should be held to be libelous because of the potentially harmful and widespread effects of such defamation.”
I do not regard the language of Judge Cardozo as precluding recovery here. He was not restricting the law of libel, but rather extending to a stenographer's transcribing of dictated defamation the rule which had previously applied when defamatory material had been read by a telegrapher, or the compositor in a printing house, or the copyist who reproduced a longhand draft (Ostrowe v. Lee, 256 N. Y. 36, 38, supra).
“ Permanence of form ” was the factor which justified such an extension; it is not necessarily a prerequisite to a libel. “ That defamation by radio * * * lacks the measure of durability possessed by written libel, in nowise lessens its capacity for harm ” (Fuld, J., concurring in Hartmann v. Winchell, p. 304, supra).
Cardozo himself was the first to recognize the duty of the courts to extend an established principle of law to a new technological development to which the logic of the principle applied, even though it was not covered by the literal language of the previous decisions. “ Precedents drawn from the days of travel by stage coach do not fit the conditions of travel to-day. The principle that the danger must be imminent does not change, but the things subject to the principle do change. They are whatever the needs of life in a developing civilization require them to be ” (MacPherson v. Buick Motor Co., 217 N. Y. 382, 391).
In justifying the imposition of what may have been an unanticipated liability of the automobile manufacturer to the ultimate purchaser for its negligent failure to inspect a wheel bought from a parts manufacturer, he said (Nature of the Judicial Process, pp. 145-146):
‘ ‘ But the truth is, as I have said, that even when there is ignorance of the rule, the cases are few in which ignorance has determined conduct. Most often the controversy arises about something that would have happened anyhow. * * * A wrong in any event has been done. The question is to what extent it shall entail unpleasant consequences on the wrongdoer.
‘ ' say, therefore, that in the vast majority of cases the retrospective effect of judge-made law is felt either to involve no hardship or only such hardship as is inevitable' where no rule has been declared.”
*865 And Cardozo applied the principle to new developments where defendant’s fault was negligence. Defamation is an intentional tort, where there is less reason to protect the wrongdoer. (Cf. Ultramares Corp. v. Touche, 255 N. Y. 170.)
The genius of the common law to meet this challenge posed by the “ needs of life in a developing civilization” has been reiterated in two subsequent landmarks of the law. Oppenheim v. Kridel (236 N. Y. 156) for the first time permitted a wife as well as a husband to maintain an action for criminal conversation. The court said, per Crane, J. (pp. 16A-165):
*‘ The common law is not rigid and inflexible, a thing dead to all surrounding and changing conditions, it does expand with reason. The common law is not a compendium of mechanical rules Avritten in fixed and indelible characters, but a living organism which grows and moves in response to the larger and fuller development of the nation. * * *
‘ ‘ In fact, there has been no objection raised anywhere to the right of the wife to maintain the action for criminal conversation except the plea that the ancient law did not give it to her. Reverence for antiquity demands no such denial. Courts exist for the purpose of ameliorating the harshness of ancient laws inconsistent with modern progress when it can be done without interfering Avith vested rights. ’ ’
The recent case of Woods v. Lancet (303 N. Y. 349) was the first to allow recovery for prenatal injuries, tortiously inflicted on a nine-month-old foetus, viable at the time and actually born later. The court went much further than it is necessary to go here because it specifically overruled its earlier decision in Drobner v. Peters (232 N. Y. 220). In the case at bar, as already noted, there is no precedent against sustaining the complaint except one decision of the Special Term. In the-Woods case the court said, per Desmond, J. (pp. 354^355):
‘ ‘ Of course, rules of law on which men rely in their business dealings should not be changed in the middle of the game, but Avhat has that to do with bringing to justice a tort-feasor who surely has no moral or other right to rely on a decision of the New York Court of Appeals? Negligence law is common law, and the common law has been molded and changed and brought up-to-date in many another case. Our court said, long ago, that it had not only the right, but the duty to re-examine a question where justice demands it (Rumsey v. New York & N. E. R. R. Co., 133 N. Y. 79, 85, 86, and see Klein v. Maravelas, 219 N. Y. 383). That opinion notes that Chancellor Kent, more than a century ago, had stated that upwards of a thousand cases *866 could then be pointed out in the English and American reports ‘ ‘ which had been overruled, doubted or limited in their application ” ’, and that the great Chancellor had declared that decisions which seem contrary to reason ‘ “ ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error.” ’ * * *
1 ‘ The sum of the argument against plaintiff here is that there is no New York decision in which such a claim has been enforced. Winfield’s answer to that (see IT. of Toronto L. J. article, supra, p. 29) will serve: ‘ if that were a valid objection, the common law would now be what it was in the Plantagenet period.’ And we can borrow from our British friends another mot: ‘ When these ghosts of the past stand in the path of justice clanking their mediseval chains the proper course for the judge is to pass through them undeterred ’ (Lord Atkin in United Australia, Ltd., v. Barclay’s Bank, Ltd., [1941] A. C. 1, 29). We act in the finest common-law tradition when we adapt and alter decisional law to produce common-sense justice.”
That an action novel in form or detail but sound in principle should be sustained despite the lack of exact precedent, was established 60 years ago by Vann, J., speaking for the court in Kujek v. Goldman (150 N. Y. 176). He said (p. 178): “ While no precedent is cited for such an action, it does not follow that there is no remedy for the wrong, because every form of action when brought for the first time must have been without a precedent to support it. Courts sometimes of necessity abandon their search for precedents and yet sustain a recovery upon legal principles clearly applicable to the new state of facts, although there was no direct precedent for it, because there had never been an occasion to make one. ’ ’
Defendants argue that the application of the law of libel to broadcasting or telecasting without a script must be made (if at all) by the Legislature rather than the courts. Such legislation has been enacted in England (see Gratley on Libel and Slander, supra). However, I do not agree that such a change must await legislative action.
In Woods v. Lancet (supra) Judge Desmond said (pp. 355— 356): “ The same answer goes to the argument that the change we here propose should come from the Legislature, not the courts. Legislative action there could, of course, be, but we abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule. Perhaps, some kinds of changes in the common law *867 could not safely be made without the kind of factual investigation which the Legislature and not the courts, is equipped for. Other proposed changes require elaborate research and consideration of a variety of possible remedies — such questions are peculiarly appropriate for Law Revision Commission scrutiny, and, in fact, the Law Revision Commission has made an elaborate examination of this very problem (1935 Report of N. Y. Law Revision Commission, pp. 449-476). * * * The report, itself, contained no recommendations for legislation on the subject but that apparently was because the commission felt that it was for the courts to deal with this common-law question. At page 465, for instance, the report said: " The common law does not go on the theory that a case of first impression presents a problem of legislative as opposed to judicial power. ’ ”
He said further (p. 355): “And Justice Sutherland, writing for the Supreme Court in Funk v. United States (290 U. S. 371, 382), said that while legislative bodies have the power to change old rules of law, nevertheless, when they fail to act, it is the duty of the court to bring the law into accordance with present day standards of wisdom and justice rather than ‘ with some outworn and antiquated rule of the past \ No reason appears why there should not be the same approach when traditional common-law rules of negligence result in injustice (see Hagopian v. Samuelson, 236 App. Div. 491, 492, and see Justice Stone's article on ‘ The Common Law in the United States ’, 50 Harv. L. Rev. [1936], pp. ér-l).”
In Rozell v. Rozell (281 N. Y. 106) the court said, per Rippey, J. (pp. 112-114):
“It is also urged that the courts should wait until there is legislative sanction for such an action (Mertz v. Mertz, 271 N. Y. 466). There is no rule of law existing today in this State by which actions between brothers and sisters for tortious negligence may not be maintained. We are not changing any existing rule of law or modifying or upsetting any judicial decision. It is not necessarily the function of a court to refuse to declare a rule of conduct until the economic and social order of the day forces its declaration by the State. The genius of the common law lies in its flexibility and in its adaptability to the changing nature of human affairs and in its ability to enunciate rights and to provide remedies for wrongs where previously none had been declared (Oppenheim v. Kridel, 236 N. Y. 156). * * *
“ The law is not static. Even though the past furnishes no current declaration of the right to maintain such an action, neither reason nor logic dictates that it must be held that no *868 such cause of action exists. The declaration of legal rights arises when the occasion presents itself for such a declaration, when social and economic progress commands that such a one be made. If we are to be tied down to precedent without exception, the law must remain static, something inflexible and unadaptable to new or changing conditions as they arise.”
Our own courts experience no difficulty in applying the law of libel to the new instrumentality of the motion picture because “ In the hands of a wrongdoer these devices have untold possibilities toward producing an effective libel”. Brown v. Paramount Publix Corp. (240 App. Div. 520, 522, supra) sustained a complaint for libel brought by the mother of the murdered girl in People v. Gillette (191 N. Y. 107), for the manner in which she and her daughter were portrayed in defendant’s production of “An American Tragedy”. The court said, per Bliss, J. (p. 522): “ This is a comparatively new form of libel. It is not accomplished by the printed word, but by the somewhat recent invention of the talking motion picture. The exhibition is made to the public by means of projecting from a film onto a screen a series of a large number of still pictures so rapidly that the objects there displayed present the illusion of moving and acting as in everyday life. Accompanying these projected pictures are sounds mechanically reproduced and so synchronized that they appear to emanate from the objects on the screen. We are told that many of the scenes which upon the screen appear to be real are produced artificially and by illusion. Such a production may be libelous. (Merle v. Sociological Research Film Corp., 166 App. Div. 376.) In the hands of a wrongdoer these devices have untold possibilities toward producing an effective libel. * * * We are reminded, in this connection, of the ancient libel committed by the burning of the plaintiff in effigy.”
In Merle v. Sociological Research Film Corp. (supra) the First Department affirmed on the opinion of Lehman, J., at Special Term. He said (p. 378): “ A suit for libel based upon a moving picture production is a somewhat novel proceeding, but there is no doubt that if the production tends to bring a person into disrepute it may give rise to such an action.” ^
^ As to radio, the Federal courts have experienced no difficulty in applying the Copyright Law to the newly developed instrumentality. If that can be done with a statute, it would follow a fortiori for the common law which is much more flexible.
In Remich & Co. v. American Automobile Accessories Co. (5 F. 2d 411-412) the court said, per Mack, J.:
*869 ‘ ‘ While the fact that the radio was not developed at the time the Copyright Act (Comp. St. §§ 9517-9524, 9530-9584) was enacted may raise some question as to whether it properly comes within the purview of the statute, it is not by that fact alone excluded from the statute. In other words, the statute may be applied to new situations not anticipated by Congress, if, fairly construed, such situations come within its intent and meaning. Thus it has been held both in this country and England that a photograph was a copy or infringement of a copyrighted engraving under statutes passed before the photographic process had been developed. Gambart v. Hald, 14 C. B. N. S. 303; Rossiter v. Hall, 5 Blatchf. 362, Fed. Cas. No. 12,082. While statutes should not be stretched to apply to new situations not fairly within their scope, they should not be so narrowly construed as to permit their evasion because of changing habits due to new inventions and discoveries.
“Bills have been introduced in both House and Senate to permit broadcasting without infringing copyrights. The rights of composer, producer, performer, and the public under this new method of reproduction are eminently matters for considered legislation; but, until Congress shall have specifically determined the relative rights of the parties, we can but decide whether and to what extent statutes covering the subject-matter generally, but enacted without anticipation of such radical changes in the method of reproduction, are, fairly construed, applicable to the new situation.”
In Buck v. Jewel-La Salle Realty Co. (283 U. S. 191) the court said, per Brandeis, J. (pp. 196-197, footnotes omitted): “ The defendant contends that the Copyright Act may not reasonably be construed as applicable to one who merely receives a composition which is being broadcast. Although the art of radio broadcasting was unknown at the time the Copyright Act of 1909 was passed, and the means of transmission and reception now employed are wholly unlike any then in use, it is not denied that such broadcasting may be within the scope of the Act. ” The fourth cause of action would ordinarily be sufficient under section 51 of the Civil Rights Law. However, the use of plaintiff’s name and picture for defendant’s alleged commercial advantage was solely in connection with the statements held to state a cause of action for libel. Under these circumstances, the civil rights action is merged in the libel action (D’Altomonte v. New York Herald Co., 208 N. Y. 596; Binns v. Vitagraph Co., 210 N. Y. 51, 59, affg. 147 App. Div. 783, 787; Seelman on Law of Libel and Slander, p. 3, § 9).
*870 Accordingly the motion to dismiss is denied as to the first three causes of action but granted as to the fourth. Settle order.
(On reargument as to fourth cause of action; decided January 8, 1957.)
Plaintiff seeks reargument of so much of the decision heretofore made as dismisses the fourth cause of action under the Civil Rights Law, upon the ground that it merged in the first three causes of action for libel. Defendants ask that upon such reargument I reconsider the sufficiency of the civil rights action.
The sufficiency of that cause of action was thoroughly briefed by both sides on the original motion. Rereading of defendants ’ authorities confirms the determination then reached. If plaintiff’s name and picture were used without his consent as part of the program telecast by defendants; and if this was done for the purpose of increasing the value of the program to defendants, then the jury may find that plaintiff’s rights under section 51 of the Civil Rights Law have been violated (Rhodes v. Sperry & Hutchison Co., 193 N. Y. 223; Binns v. Vitagraph Co., 210 N. Y. 51; Franklin v. Columbia Pictures Corp., 246 App. Div. 35, affd. 271 N. Y. 554).
The question of merger was not raised in either brief upon the original motion and my own examination of the authorities led to the conclusion stated therein.
The problem was first presented in Binns v. Vitagraph Co. (supra). That involved a single cause of action brought under the Civil Rights Law. The jury returned a verdict of $12,500. The trial court reduced this to $2,500 because ‘ ‘ he considered that in so far as this use of the plaintiff’s name and picture constituted a libel there could be no recovery in this action ” (see 147 App. Div. 783, 787). The First Department reinstated the verdict, saying, per Laughliít, J. (ibid), “ We are of opinion that the plaintiff can have only one recovery in the premises and that it must be in this action. The terms of the statute are very broad and they include all of the damages sustained by the plaintiff. It would be difficult to avoid a double recovery if the jury were to be permitted in one action to give damages under the statute for a violation of rights protected thereby, and in another action for the libel based on the same acts. ’ ’
The problem was next presented in D’Altomonte v. New York Herald Co. (154 App. Div. 453). There the complaint alleged two causes of action, the first for libel, and the second under the Civil Rights Law. The First Department unanimously sustained the civil rights cause of action, and a majority sustained *871 the libel cause of action. The court was also unanimous in holding that the causes of action were properly joined, saying, per Scott, J. (p. 457): “It is apparent that both causes of action arise out of the same transaction, to wit, the publication of the article complained of. All the damages the plaintiff suffered in consequence of the publication must be recovered in the same action. (Binns v. Vitagraph Co., 147 App. Div. 783.) ” On appeal, the Court of Appeals sustained the libel cause of action, but dismissed the civil rights cause of action, and held that the two causes of action had been properly united in the complaint (208 1ST. Y. 596). Eight months later the Court of Appeals affirmed the Binns case, and specifically expressed its agreement with the language of the Appellate Division in that case, which has been quoted above (210 N. Y. 51, 59).
Under these circumstances, I read the D’Altomonte case as holding merely that it is proper for plaintiff to do what was done in the case at bar, namely, to allege both causes of action in the one complaint in order that the sufficiency of each may be separately examined. Since only one cause of action was sustained in D’Altomonte, the difficulty of avoiding a double recovery which Binns warned against did not arise. This interpretation was confirmed by the language of the First Department in Franklin v. Columbia Pictures Corp. (246 App. Div. 35, supra). The complaint therein involved three causes of action. The trial court allowed $2,500 for the violation of plaintiff’s civil rights, $2,500 for the libel in the same publication and $2,000 for the slander in the same publication, and awarded a single judgment for $7,000. In reducing this judgment to $5,000, the court, per Glenstost, J., held (pp. 36-37):
“ Prior to trial no claim was advanced by the appellant that the causes of action had been improperly united, nor was any motion made to compel respondent to make an election. Upon the trial however, the appellant asked that the respondent be required ‘ to elect as to which of these three causes of action as stated by him in the complaint he expects to stand on. ’ The court denied the motion.
“ The point has been made by the appellant that the court erred in making an award which was based upon the several causes of action. It is undoubtedly true that respondent could have obtained all the damages he suffered in a cause of action based solely upon a violation of his civil rights. In Binns v. Vitagraph Co. (210 N. Y. 51) the Court of Appeals held in effect that all damages accruing under circumstances such as we have here are recoverable in a civil rights action. * * *
*872 ‘ ‘ There the court had under review the question as to Binns ’ right to recover for libel as part and parcel of his cause of action for a violation of his civil rights. Here the court had under consideration a liability which arose out of the libel and slander in connection with the unlawful exhibition of respondent’s picture. If the matter contained in the second and third counts had been pleaded as a part of the first cause of action the court necessarily would have considered the libel and slander as elements of damage in making up the award. The net result was a just one and should not be disturbed on mere technicalities.
“We believe, however, that the judgment in the sum of $7,000 was excessive and should be reduced to the sum of $5,000.” (Italics supplied.)
This was affirmed without opinion (271 N. Y. 554). The State Reporter’s memorandum says (pp. 554-555): “ The Appellate Division held that if the matter contained in the second and third causes of action had been pleaded as a part of the first cause of action, the court necessarily would have considered the libel and slander as elements of damage in making up the award, that the net result was a just one and should not be disturbed on mere technicalities; but reduced the damages to the sum of $5,000.”
It seems to me that both courts indicated that where the defamation cause of action and the civil rights cause of action are each legally sufficient, they should not both go to the jury because of the difficulty of avoiding a double recovery, but that the error could be corrected in that case by reducing the judgment rather than by ordering a new trial. Plaintiff’s argument that the Binns’ holding is restricted to separate actions is negatived by the express language in the Franklin case that it applies equally to separate causes of action. The same danger exists that a jury might give overlapping damages, allowing some recovery for the invasion of privacy under the libel count and some recovery for defamation under the civil rights count.
I recognized that under the Binns and Franklin cases the converse proposition does not apply and that plaintiff may not properly recover, as part of his damages under the libel count, any damages for invasion of his right of privacy; However, in the instant case, plaintiff alleges damages of $1,000,000 for the libel, contrasted with $100,000 for invasion of his privacy. If he were to be allowed to prosecute only one cause of action, it seemed to me his desire was to press the former; that was the basis for the original determination dismissing the civil rights count.
*873 Upon this motion for reargument, plaintiff cites Jackson v. Consumer Pub. (256 App. Div. 708) and Dache v. Abraham & Straus (269 App. Div. 692).
In the former case, the complaint alleged both a libel cause of action and a civil rights cause of action. Special Term dismissed the former but sustained the latter. ‘ ‘ As plaintiff alone appealed, the sole issue is the sufficiency of the first cause of action in libel.” (P. 709.) The court held it sufficient, and therefore denied the motion to dismiss. In the latter case, the complaint commingled in a single cause of action the damages both for libel and for violation of the right of privacy (see 39 N. Y. S. 2d 981, 983). In a companion action, Special Term had dismissed as insufficient a cause of action for libel, based upon the same publication (John-Frederics, Inc., v. Abraham & Straus, 39 1ST. Y. S. 2d 979). In the cited case, he granted a motion requiring plaintiffs separately to state and number their alleged causes of action, and this was affirmed.
Further proceedings on this issue in either case are not reported. It would therefore appear that the holdings are no different from the one in D’Altomonte v. New York Herald Co. (supra), viz., that the causes of action should be separately pleaded in order that their legal sufficiency may be tested.
I am, however, impressed by plaintiff’s argument as to the serious prejudice which he may suffer by a dismissal of the civil rights cause of action in advance of trial. Further consideration persuades me that this prejudice outweighs any that may be suffered by defendants if their motion is denied at this time, and that the underlying purpose of our system of liberalized pleading would best be served by reserving this problem for disposition by the Trial Justice.
Possible prejudice to defendants results from the danger already noted that the jury may award overlapping damages on each cause of action. But one of the causes of action may be dismissed after trial for insufficiency of proof or the trial court may conclude after hearing all of the proof that plaintiff should be required to elect on which cause of action he wishes to go to the jury. Even if the trial court submits both causes to the jury, he can give them explicit instructions for the purpose of avoiding this overlapping and if the size of the verdict indicates that these instructions were disregarded, the verdict can be reduced, as it was done in the Franklin case.
On the other hand, if plaintiff is now required to confine himself to the cause of action for libel, he may find at the trial that he is unable to establish this cause of action while he could have proved the one for invasion of his right to privacy. It is *874 true that, legalistically speaking, he could, recover all of his damages if he elected to stand on the civil rights cause of action alone. But we must be realistic about what is likely to happen in the jury room.
The average juror is familiar with the traditional common-law action for libel and with the right of the plaintiff who has been defamed to recover compensatory damages, as well as exemplary damages in a proper case. The statutory cause of action given by section 51 of the Civil Rights Law is of comparatively recent origin, and does not carry the same connotation of willful wrongdoing as a libel does. Compare Roberts v. Condé Nast Pub. (286 App. Div. 729) with Crane v. Bennett (177 N. Y. 106) and Reynolds v. Pegler (123 F. Supp. 36, affd. 223 F. 2d 429).
It is reasonable to anticipate that a jury would not award the same measure of damages for a libel when considered as part of a civil rights count as they would in a conventional libel count. This probability would be even greater if the jury found as a fact that there was no invasion of plaintiff’s right to privacy, but were nevertheless told that they could in such a cause of action give him damages for his libel. Even the clearest instructions might not remedy this difficulty. Such possible confusion would be particularly unfortunate in the case at bar where (as already stated) plaintiff alleges damages of $1,000,000 from the libel contrasted with damages of $100,000 for the invasion of privacy.
For the foregoing reasons, the motion for reargument is granted. Upon such reargument, the fourth cause of action is held to be sufficient, and the motion to dismiss is denied, without prejudice to such motions as defendants may wish to make after trial on the basis of the joinder of that cause of action with the causes of action for libel. Settle order.