Calvin GEARHART, Plaintiff,

v.

WSAZ, Inc., Defendant.

No. 364.

United States District Court
E. D. Kentucky,
Catlettsburg Division.

March 9, 1957.

W. H. Dysard, E. Poe Harris, Ashland, Ky., for plaintiff.

Campbell, McNeer & Woods, by L. E. Woods, Jr., Selden S. McNeer, Jr., Huntington, W. Va., John L. Smith, Catlettsburg, Ky., for defendant.

SWINFORD, District Judge.

This case was tried by a jury and resulted in a verdict for the plaintiff in the sum of five thousand dollars.

The record is before the court on various motions filed by the defendant attacking the verdict and asking that a

judgment in favor of the defendant be entered. I will consider these motions in the order in which they are presented.

The first motion which the defendant files is a renewal of its defense that the action should be dismissed because the court does not have jurisdiction of the person of the defendant.

In order to properly consider this motion and the other motions which will be later discussed it is necessary to give the background and matters of which the court may take judicial cognizance which do not specifically appear in the record. One of the things of which the court takes cognizance is the geographic location and situation of the respective parties. These facts and related matters disclosed by the record are pertinent and important to the application of the law and the ultimate determination of the motions presented.

All of the circumstances out of which this action arose took place in what is known as the Tri-State area of Kentucky, Ohio and West Virginia, a highly industrial section of the Ohio River valley. Boyd County, Kentucky, is adjacent to West Virginia. Catlettsburg, the county seat, is separated from West Virginia only by the Big Sandy River. Boyd County is densely populated. It also contains the City of Ashland which is the home of Armco Steel Corporation. Directly east of the City of Ashland, which has an estimated population of 31,000, is the City of Catlettsburg with a population of approximately 6,000. The area, immediately adjacent, in West Virginia is very similar to Boyd County, Kentucky, in that it is densely populated and highly industrialized. The cities of Kenova, Ceredo and Huntington have a combined population of more than 100,-000. In summation it might be said that from the western boundary of Ashland, Kentucky, to the eastern boundary of Huntington, West Virginia, there is one industrial city of approximately 140,000 people.

Located about 15 miles from the City of Catlettsburg, Huntington is the home of the defendant, a broadcasting and telecasting corporation. The defendant holds a dominant position from the standpoint of dissemination of news in the western part of West Virginia and the whole northeastern part of Kentucky. It is a very powerful broadcasting and telecasting station. In the matter of television it has no competition and its Channel 3 is the only station that is received throughout a section of Kentucky, including the County of Boyd. It reaches several hundred thousand people.

The defendant is a West Virginia corporation which has not qualified to do business in Kentucky. It operates its stations from the City of Huntington, West Virginia. None of the facilities used in this connection are located inside the State of Kentucky. It has no office in Kentucky; it has no employees or agents who reside in Kentucky. The principal source of income to the defendant is derived from advertising over its radio and television stations. Less than four per cent of the total advertising revenue of the defendant for the year preceding the matters complained of in this action represented advertising sold to persons and firms located in Kentucky. The defendant says that most of its advertising was sold through agents located outside of Kentucky; that only infrequently and irregularly had an employee traveled in Kentucky and solicited advertising from Kentucky firms; and that the amount of such advertising so solicited was only 1.03% of the total advertising revenue.

The plaintiff instituted this action in the Circuit Court of Boyd County and executed service of process on the defendant by serving the process upon the Secretary of State of the Commonwealth of Kentucky pursuant to the provisions of KRS 271.610. Upon petition of the defendant the action was removed to the federal court on the ground of diversity of citizenship. 28 U.S.C.A. § 1441.

It cannot be disputed that the jurisdiction of the federal court in cases of diversity of citizenship is a derivative jurisdiction. This court only acquires

jurisdiction of the subject matter of the action or the parties if the Boyd Circuit Court in which it was originally filed had jurisdiction of the defendant. Lambert Run Coal Co. v. Baltimore & Ohio R. Co., 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671; Simpson v. Southwestern Railroad Co., 5 Cir., 1956, 231 F.2d 59.

KRS 271.385 provides that every foreign corporation, except foreign insurance companies, carrying on business in this state, shall at all times have an office in this state and an authorized agent upon whom process can be served. Where this statute is not complied with, a foreign corporation so doing business is deemed to have made the Secretary of State its agent for the service of process in any civil action instituted in the courts of this state against such corporation involving a cause of action arising out of or connected with the doing of business by such corporation in this state. KRS 271.610(2).

 The jurisdiction of this court rests upon a determination of the question of whether or not the defendant was doing business in the State of Kentucky at the time of the acts of which the plaintiff complains.

Television and radio broadcasting are in interstate commerce. The programs broadcast by the defendant were received by persons possessing television and radio sets, not only within the borders of the home state of the defendant, but in Kentucky and other states and very pointedly in the County of Boyd, City of Catlettsburg, Kentucky, which was the home of the plaintiff. There is no way by which these broadcasts could be confined to the State of West Virginia. The defendant was advertising things for sale and claimed to reach a listening and seeing public of many hundreds of thousands of people. It was on this fact, we must assume, that it made its charges for advertising on which it says it relies for its principal income and in fact for its very existence. I do not believe that it could be said that a radio or telecasting company could be said to be doing business in all the states to which its broadcasts and telecasts reached, but where the buying public, which is sought by its customers as advertisers, was in the immediate locality of the places of business of the things advertised, a strong case could be made out on that fact alone, especially where the defendant was within a distance of less than twenty miles from the jurisdiction of the court where the plaintiff sought redress for an alleged tort.

One of the standards suggested as a criterion in determining the question of what is and what is not "doing business" in the case of International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 158, 90 L.Ed. 95, is to estimate the inconvenience "which would result to the corporation from a trial away from its 'home' or principal place of business".

The record discloses that over a considerable period of time the defendant sought out and contracted with various merchants and business people in Kentucky for advertising over its stations. It entered into written contracts. It had representatives solicit advertising in person and engaged business people in written contracts extending over weeks and months.

It is a basic principle of justice that the jurisdiction of a court to render a personal judgment is limited and dependent upon the presence of the defendant within the territorial jurisdiction of the court. This principle was established in Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565. In order for this court to acquire jurisdiction of the defendant it must be disclosed by the record that the presence of the defendant in the territorial jurisdiction of this court is more than the casual presence of an agent or isolated incidents of activity in the state on the defendant's behalf. Frene v. Louisville Cement Co., 77 U.S.App.D.C. 129, 134 F.2d 511, 146 A.L.R. 926.

The opinion in the Frene case sets forth that the fundamental underlying principle of the "doing business" concept is the maintenance within the jurisdiction of a regular course of business

activities. See also an opinion of this court in Brandeis Machinery & Supply Co. v. Matewan Alma Fuel Corp., D.C., 147 F.Supp. 821.

It is admitted by the defendant that it. solicited business in Kentucky, but that the amount of business so solicited amounted to only 1.03% of the total advertising revenue during the year preceding the tort complained of. While the small amount of business percentagewise is a circumstance to be considered, it is not sufficient to justify the court in dismissing the action in the light of all the circumstances. The percentage is small, but it may run into thousands of dollars, depending, of course, upon the amount of overall business done. It does not necessarily follow that the solicitation for business was not regular, continuous and persistent, rather than merely casual. Nippert v. City of Richmond, 327 U.S. 416, 66 S. Ct. 586, 90 L.Ed. 760.

On July 13, 1951, this court handed down an opinion in the case of Star Elkhorn Coal Co. v. Red Ash Pocahontas Coal Co., D.C., 102 F.Supp. 258. In that case the exact question here presented was discussed. The court said the term "doing business" has been so frequently discussed and so variously applied that authority can be found for any position a court takes in a given state of facts. That observation holds true today and this difficult question is apparently incapable of escaping tortuous discussion and hesitant application. The case of International Shoe Co. v. State of Washington, supra, reviewed the whole history of the law and sought to lay down guiding principles, but the opinion pointed out that the boundary line between activities which justify the subjection of a corporation to suit and those which do not cannot be simply mechanical or quantitative. The court said:

"The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. St. Louis S. W. R. Co. v. Alexander, supra, 227 U.S. [218] 228, 33 S.Ct. 245, 57 L.Ed. 486; International Harvester Co. of America v. Commonwealth of Kentucky, supra, 234 U.S. [579] 587, 34 S.Ct. [944] 946, 58 L.Ed. 1479. Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations. Cf. Pennoyer v. Neff, supra; Minnesota Commercial Men's Ass'n v. Benn, 261 U.S. 140, 43 S.Ct. 293, 67 L.Ed. 573.

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue."

The language of Mr. Justice Black in his opinion, concurring in part and dissenting in part, in Polizzi v. Cowles Magazines, 345 U.S. 663, 73 S.Ct. 900, 904, 97 L.Ed. 1331, seems appropriate. The Justice said:

"There may have been some reason for snarling up lawsuits against foreign corporations a ʌundred years ago because of newly expanding activities of migratory businesses. But there is no such excuse now. A large part of the business in each and every state is done today by corporations created under the laws of other states. To adjust

the practical administration of law to this situation the Court in recent years has refused to be bound by old rigid concepts about 'doing business'. Whether cases are to be tried in one locality or another is now to be tested by basic principles of fairness, unless, as seems possible, this case represents a throwback to what I consider less enlightened practices."

The defendant cites in its brief a number of cases dealing with this subject. Several of these cases are from state courts and I do not have the opinions in their entirety available for my examination. It should be pointed out that all of the cases available to me, with one exception, with factual situations of varying degrees of difference from those of the case at bar, were decided before the decision of the Supreme Court in International Shoe Co. v. State of Washington, supra. The one case on which the defendant relies that has been decided since is the case of Nichols v. Cowles Magazines, D.C., 103 F.Supp. 864. In that case the court points out in its opinion that the service of process was not authorized in the light of the Massachusetts authorities for the reason that the cause of action did not arise out of the activities of the defendant in the state since the publication of the matter which was the subject of the tort complained of took place entirely outside Massachusetts. I prefer the reasoning of the court in the more recent case of McClendon v. Curtis Bay Towing Co., D.C., 130 F.Supp. 455, on page 458, where the court said, "Nor does the fact that the claim did not arise out of the corporation's activities within the State require dismissal for lack of jurisdiction. While this also is a factor to be considered, in and of itself it is not conclusive. Once it is found that the defendant's activities are continuous and substantial the test still is one of 'fair play and substantial justice' ".

The opinion of the court in Scholnik v. National Airlines, 6 Cir., 219 F.2d 115, 118, indicates a preference for the liberal rule on the question of jurisdiction which International Shoe Co. v. State of Washington, supra, suggests. Judge Miller in the opinion said:

"We are of the opinion that the rule applied in the Green [Green v. Chicago, B. & Q. R. Co., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916] and McKibbin [Philadelphia & Reading Co. v. McKibbin, 243 U.S. 264, 37 S.Ct. 280, 61 L.Ed. 710] cases has been materially changed by later decisions of the Supreme Court. In Lasky v. Norfolk & W. Ry. Co., 6 Cir., 157 F.2d 674, we considered a situation similar to those in the Green and McKibbin cases in the light of the Supreme Court's opinion in International Shoe Co. v. State of Washington, supra. On the authority of that case we held that the defendant carrier, although a foreign corporation with no part of its lines located in the Northern District of Ohio, and although it made no contracts, issued no bills of lading and sold no tickets in the Northern District, was nevertheless doing business in the district and subject to service of process therein, by reason of the extensive and continuous solicitation of business by it in the district. In our opinion, such activity on its behalf within the district supplied the minimum contacts on the part of the corporation with the state of the forum as to make it reasonable to require the corporation to defend a particular suit brought in that district. See also: Bach v. Friden Calculating Machine Co., 6 Cir., 167 F.2d 679; Frene v. Louisville Cement Co., 77 U.S.App.D.C. 129, 134 F.2d 511 [146 A.L.R. 926]."

The motion to dismiss the action on the ground that the court does not have jurisdiction of the person of the defendant should be overruled.

Before setting out the further motions filed by the defendant, it is necessary to state the facts of the case on which the plaintiff seeks recovery. The plaintiff

is a young lawyer of the Boyd County bar. He ran for county attorney on a reform platform. In his race he committed himself to vigorous prosecution of persons engaged in gambling, bootlegging and vice. He was elected to the office which he sought and entered upon his duties as county attorney on January 3, 1954.

He testified that in an effort to carry out his platform commitments and promises he officially engaged the services of state law enforcement officers but was unsuccessful in uncovering law violations through their efforts. He then entered into negotiations with private citizens to make investigations and assist him in uncovering law violations and vice in Boyd County. One of the citizens from whom he sought help was a local man by the name of Darwin Scott, disclosed by the record to be an underworld character and known to the plaintiff to be such. Through Scott the plaintiff induced three other men to come to Boyd County. Two of the three strangers pretended to make investigations and secure evidence by patronizing alleged local places of law violation. They gave their names to the plaintiff as county attorney and appeared before the grand jury. They offered what was later found to be perjured testimony as they had not made investigations and had not secured lawful evidence. During the process of the investigation and presentation of evidence to the grand jury the men were compensated and paid by the plaintiff and Circuit Court Clerk Gerald Lyons with funds furnished in part or in whole by the Boyd County Ministerial Association. The indictments secured were found to be defective and dismissed on a legal technicality. The plaintiff presented the cases again to a later grand jury and offered the testimony of one of the three strangers who had testified for the county in the former presentation of the cases.

The other two strangers had become involved in the commission of a robbery in Boyd County and were being held in jail. They were not presented to the grand jury. The witness who did testify, and on whose statements indictments were secured, gave a fictitious name, the same he had used on the former occasion at the time he was offered by the plaintiff as a witness to the grand jury. It is shown that the plaintiff knew at the time he presented the witness that he was not using what was later claimed to be his right name.

This witness was later charged with perjury and held in jail. We thus find the three strangers who were represented as investigators, and who were brought to Boyd County by Darwin Scott at the instance of the plaintiff, to be criminals and held in jail to await trial for crimes against the State of Kentucky.

Certain local women, connected by marriage or friendship with some of the persons who were indicted, proceeded to file charges against the plaintiff with the Kentucky State Bar Association, seeking the discipline by the Association of the plaintiff for alleged misconduct as a member of the bar and as a public official. The Secretary of the Kentucky State Bar Association, upon request, declined to give information as to the nature of the charges or even that any charges had been filed.

I have had to give these facts in rather minute detail in order that it might appear what was the reason for the alleged defamatory statements broadcast and televised by the defendant.

On April 12, 13, and 14, 1955, on five different occasions, the defendant, throughout this three-day period, on its regular news broadcast and telecast, from a manuscript, among other things said:

"A politically explosive storm is brewing in Catlettsburg, Kentucky, and in the center is the young Boyd County Attorney, Calvin Gearhart. Charges against the 33 year old Gearhart have been brought before the Kentucky State Bar Association in accusing him of having permitted a witness to testify before the grand jury under a false name with full

knowledge that it was a false name. * * *

" * * * accusations with stronger implications have been fired and little Catlettsburg's rumor mill is going full blast. A group of prisoners in the county jail, two of whom already have pleaded guilty to robbery and face possibly the next 20 years in prison, contend that Gearhart, along with Boyd Circuit Court Clerk Gerald Lyons, and a convicted criminal named Darwin Scott, who is in the Federal Penitentiary in Atlanta, hatched a plot to take over the city rackets, shake down the gamblers and bootleggers for a payoff in return for permission to operate. * * *

" * * * Through Darwin Scott, Gearhart hired two men who gave their names as Robert Yager and James Russell to investigate gambling and bootlegging in Catlettsburg. Their pay was to be underwritten by the County Ministerial Association. * * * Just before the September term of court, Gearhart learned that one of his investigators, Russell, was also known by the name, Bill Dalton. The next grand jury convened in December and Dalton gave the identical testimony he contributed in June, once again under the name of Russell. * * * The man known as Yager did not testify. As the grand jury met, Yager was in jail in Ironton, Ohio, picked up in the roundup of a robbery gang which had pulled several jobs in Huntington, Ashland and Catlettsburg. Yager's name turned out to be Raymond Speed and during the course of his interrogation, told of being hired by Darwin Scott and paid by Gearhart for investigating in Catlettsburg. * * * he and Dalton, alias Russell, never had investigated anything. * * *

"Speed's confession did not come to Gearhart's attention until after Russell's appearance before the grand jury. As a result of Speed's admissions, Russell became the subject of further investigation. Then it was found his real name was Bill Dalton and that Gearhart had written him several personal checks under that name * * * but had allowed him to testify before the December grand jury as Russell. * * *

"Gearhart admits he learned the witness was known by two names. * * *

"More potent accusations come from more dubious sources. The accused perjurer Dalton, alias Russell, and two members of the robbery ring in which Speed, alias Yager, were involved, in signed and notarized statements issued from the Boyd County jail, they charge as follows:

"According to Dalton, Circuit Court Clerk Gerald Lyons, Calvin Gearhart, and Darwin Scott 'hired some men to give false testimony in front of the grand jury to get indictments' so that gamblers and bootleggers 'would come to Mr. Gearhart and Mr. Lyons and pay them to forget these indictments'. * * *

"Herbert Brubaker, an exconvict who has pleaded guilty to robbery charges and awaits sentence, says that 'Gerald Lyons, Darwin Scott, and Calvin Gearhart got the sympathy of the church people, got Catlettsburg voted dry knowing that the city then would not have any revenue to meet its budget. This would leave the city at their mercy and they could organize the city and also the county by allowing bootlegging, gambling and bookmaking. In return, they were to receive one fourth of the returns from bookmaking and gambling and one dollar per case on whiskey'. * * *

"Another exconvict, James Statham, who also has pleaded guilty to robbery, says Speed told him 'Mr. Gearhart was to start a campaign against bootleggers and gamblers on

a pretext of cleaning up Catlettsburg. After the town went dry, their plans were to let gamblers and bootleggers operate only if they paid' to what he called, 'the organization of Mr. Gearhart' ". * * *

" * * * These accusations stretch across Ashland and Catlettsburg law enforcement agencies.

"A blowup is imminent. And unless somebody or some group gets to the bottom through an honest and fearless investigation, little Catlettsburg, indeed all of Boyd County, may find itself with troubles far worse than a city debt."

I have set forth some of the statements that were made in the broadcasts and telecasts in the period from April 12 to 14, inclusive.[1] Other statements of like import were contained in the broadcasts and telecasts.

The defendant takes the position that the action should be dismissed for the following reasons:

1. None of the broadcasts or telecasts made by the defendant was defamatory when considered as a whole.

2. That the only part of the statements complained of by the plaintiff which could be considered libelous is the charge that the plaintiff paid witnesses to testify falsely and the truth of this charge was proven conclusively by the admission of the plaintiff to the effect that he paid the witness Bill Dalton to testify before the grand jury under the name of James Russell in December, 1954, when plaintiff well knew that the real name of the witness was Bill Dalton. All other charges complained of by the plaintiff are mere expressions of opinion of the motives and future intentions of the plaintiff, and such opinions are not defamatory or libelous.

3. The plaintiff failed to prove any actual damages.

While there is a shade of difference between the three grounds set forth in support of this motion, I feel that

a general discussion of the evidence and the law applicable thereto applies with equal force to all of them.

The real contention of the defendant by this motion is that it is guilty of no tort for which damages could be awarded. A correct determination of the case as presented on this motion is not without difficulty. In considering the case from its beginning until the verdict of the jury was returned, the court was beset with what appeared at times to be almost insurmountable conflicting rules of law and reasoning. In some respects this is a case of first impression and a diligent search of the authorities has revealed no case which is convincing as a correct determination of the issues involved. This uncertainty, however, seems to be a part of the law of slander and libel. Only cases in which a direct crime is charged seem free of doubt as to what the law is and what is libelous per se.

It must be recognized that the defendant, as a news gathering and news disseminating agency, is under a professional and moral obligation to disclose facts. If those facts involve the actions and conduct of public officials their importance is accentuated. The public is entitled to know the truth about those who are conducting public business. Those professing to express and reveal those facts as professionals cannot protect the persons whose conduct makes the news. We jealously guard our right of freedom of speech and courts should not, by their judgments, hamper or discourage full and free discussion of public business or circumstances connected with it. Newspapers, periodicals, broadcasts and telecasts are in many respects the greatest agencies for the protection of free government and free institutions.

Nevertheless, it is equally true that the law should respect and protect the rights of the individual and where he has been injured by a news agency or any other entity he should have redress

1. The whole broadcasts as offered in the trial are made an appendage to this opinion.

in the courts. Freedom to gather and broadcast news does not give a license to defame character and the dissemination of news must be held within the bounds of reason and justice. A reasonable degree of care in the conduct of this business, as in any other business, is required. In Sorensen v. Wood, 123 Neb. 348, 243 N.W. 82, 86, 82 A.L.R. 1105 we find the following text:

"In Peck v. Tribune Co., 214 U.S. 185, 29 S.Ct. 554, 555, 53 L.Ed. 960, 16 Ann.Cas. 1075, Mr. Justice Holmes said: 'If the publication was libelous, the defendant took the risk. As was said of such matters by Lord Mansfield, "Whenever a man publishes, he publishes at his peril" ' ".

This case was submitted to the jury on the theory that all of the evidence and all reasonable inferences which might be drawn from it raised a question as to whether or not the plaintiff had been defamed and whether or not he had suffered injury by that defamation, if any. It appeared to the court to be a case which peculiarly adapted itself to a determination by a jury as a factual situation.

The facts disclosed that a young county attorney, 33 years of age, had made a superb effort to rid his county of vice. In the conduct of that business and, as he felt, in the discharge of his duties, he had become involved with disreputable characters who were to be used as "stool pigeons" in acquiring evidence to be presented to the grand jury. He was successful in obtaining a number of indictments charging gambling and bootlegging to which numerous defendants entered pleas of guilty. This naturally stirred up enmity. Certain persons immediately set about to discredit the plaintiff. Charges were filed by three women with the Kentucky State Bar Association seeking to discipline him on the sole ground that he had presented a witness to the grand jury who claimed to have a different name from the one that he used before the grand jury which was known at the time to the plaintiff.

Three notorious criminals, incarcerated in jail, made statements about the plaintiff linking him with Darwin Scott, a local underworld celebrity, who, according to the proof had been charged with numerous law violations and was at the time serving a sentence in a federal penitentiary.

Based primarily upon the information obtained from the criminals and the fact that charges had been filed with the Secretary of the Kentucky State Bar Association and without knowledge of what the charges were, the defendant went upon the air, through its newscaster, Mr. Basso, and on five different occasions in a period of three days, in lengthy broadcasts, sent forth, as news, the fact that it was said that the plaintiff was guilty of corrupt, unethical and criminal practices as an attorney and an official of Boyd County; that he collaborated with known criminals and law violators in the organization and planning of a vicious and corrupt political machine for the purpose of exploiting his constituency and corrupting his community.

I set out above some of the statements that were made but the true significance of the harm of these broadcasts cannot be understood without considering the whole of the broadcasts and the fact that they were repeated five times. While there may be no distinction in the law as a general proposition, I believe it is proper to point out a distinction in this case between a broadcast or telecast read from a manuscript and libelous matter printed in a newspaper or publication. A written statement in its full context with proper punctuation may appear to the public in one light. The same matter read in a telecast by a trained individual, whose profession requires him to make the news interesting, by emphasis and accent may leave an entirely different impression.

It is true the defendant offered proof to the effect that before these broadcasts were made it took pains through its agents to contact various responsible individuals and discuss the truth or

falsity of the facts in their possession. Whether or not it exercised a proper degree of care in making investigation and in its subsequent conduct in broadcasting it, repeatedly, seemed to the court to be a question of fact to be submitted to the jury for its determination.

An unauthorized repetition or successive publication of libelous matter affords in itself a right of action. The law requires that such matters should be submitted to a jury so that it can determine whether the privilege claimed by the appellee should stand or fall. Riley v. Dun & Bradstreet, 6 Cir., 172 F.2d 303. In other words, the defendant could not publish the reports with reckless indifference to and disregard for truth of statements therein contained. Those who make money out of attracting a listening public to news broadcasts should not be permitted to also sell the good name, standing and integrity of honorable, conscientious officials on the uncorroborated word of criminals.

A publication must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. If it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be heard. Washington Post Co. v. Chaloner, 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987; Commercial Pub. Co. v. Smith, 6 Cir., 149 F. 704.

The Smith case, just cited, was one in which the court had decided as a matter of law that the publication was libelous per se. Our Court of Appeals for the Sixth Circuit reversed the lower court and Judge Lurton in the opinion stated that the publication was not so free from reasonable doubt as to its meaning and signification as to justify the judge in determining its effect as a matter of law. There was room for the jury, taking into consideration all the circumstances in evidence, to determine what conclusions might be conveyed to the readers.

Where the charges in a publication tend to bring the plaintiff into contempt, ridicule or disgrace, they are libelous per se and it is not necessary that they charge a criminal offense also. Washington Herald Co. v. Berry, 41 App. D.C. 322; Lane v. Washington Daily News, 66 App.D.C. 245, 85 F.2d 822; Poston v. Washington, A., & Mt. V. R. Co., 36 App.D.C. 359, 32 L.R.A.,N.S., 785.

Statements charging an attorney with dishonest or improper practices in the performance of his duty are actionable per se. Baker v. Clark, 186 Ky. 816, 218 S.W. 280.

Statements are libelous per se that charge a public official with fraud, dishonesty or misconduct. Charges affecting him in his official character and of such a nature that if true would be cause for his removal from office are actionable per se. Smith v. Pure Oil Co., 278 Ky. 430, 128 S.W.2d 931; 33 Am.Jur. 92, Sec. 79.

It is not necessary that the language contain a direct charge of felony. The words are to be taken, neither in the milder, nor in the more grievous sense, but in that sense in which they would be understood by those who heard them. The judge should not torture them into a charge of guilt, nor explain them into innocence, contrary to their obvious import. It is enough that the communication be reasonably capable of being understood as constituting a charge of a specific act or omission. A person may be defamed by a statement that he associates with persons of notoriously disreputable character or by attributing to him the characteristics of literary or historical figures of ill repute. McGowan v. Manifee, 7 T. B. Monroe 314, 23 Ky. 314; Logan v. Steele, 1 Bibb 593, 4 Ky. 593; Restatement of the Law of Torts, Vol. III, p. 155, Sec. 565.

The following quotation from Smith v. Pure Oil Co., supra [278 Ky. 430, 128

S.W.2d 932], is pertinent to the facts in the instant case:

"It has always been the law that a written publication is libelous which falsely charges or imputes dishonesty or engagement in fraudulent enterprises of such a nature as reflects upon the character and integrity of a person and to subject him to the loss of public confidence and respect. Hart v. Reed, 1 B.Mon. 166, 40 Ky. 166, 35 Am.Dec. 179. Because of the public interest this rule finds a more extensive application where the false defamatory charge or imputation affects the professional or official capacity of the person of whom it is written. If it imputes want of integrity, malfeasance or misfeasance, or is calculated to diminish public confidence in him the publication is actionable per se. Williams v. Riddle, 145 Ky. 459, 140 S.W. 661, 36 L.R.A.,N.S., 974, Ann. Cas.1913B, 1151; Spears v. McCoy, 155 Ky. 1, 159 S.W. 610, 49 L.R.A., N.S., 1033; Shields v. Booles, 238 Ky. 673, 38 S.W.2d 677; 17 R.C.L. 301; 36 C.J., 1187, 1188. Therefore, 'statements accusing officers of official oppression and misuse of office to extort fees from members of the public have repeatedly been held actionable per se.' 17 R.C.L. 303. This, obviously, is quite different from fair, reasonable and good faith comment on and criticism of public men, which is privileged. Tipton v. Rains, 228 Ky. 677, 15 S.W.2d 496. Furthermore, as is stated in Commercial Tribune Publishing Co. v. Haines, 228 Ky. 483, 15 S.W.2d 306, 307: 'It is a fundamental principle in the law of libel and slander that the defamatory matter complained of should be construed as a whole, and that the language employed therein should receive its common and ordinary acceptation in the light of the conditions and circumstances under which it was published. Also, that defamatory matter, printed or spoken, charging an officer with

neglect of his official duties, so as to disqualify him for their punctual performance and to render him unfit to discharge them, is actionable per se, and it is especially so when the defamation is printed and circulated, and the same principle applies where the language is defamatory of one in his profession.' See, also, Smallwood v. York, 163 Ky. 139, 173 S.W. 380, L.R.A.1915D, 578."

It is not necessary that the words imply a crime or impute a violation of the law, or involve moral turpitude or immoral conduct. Such words must be measured by their natural effect upon the mind of the average lay person rather than subjected to the critical analysis of the legal mind. Digest Publishing Co. v. Perry Publishing Co., Ky., 284 S.W.2d 832; Shields v. Booles, 238 Ky. 673, 38 S.W.2d 677; Sweeney & Co. v. Brown, 249 Ky. 116, 60 S.W.2d 381; Hill v. Evans, Ky., 258 S.W.2d 917.

With reference to the fact as to whether or not the language used in these broadcasts was libelous per se, I believe the following quotation from Newell on "Slander and Libel" (2d Ed.) p. 43, throws considerable light on what actually constitutes libel per se:

"Unfortunately, the law of libel has been obscured by a mass of technicalities and subtle refinements. When language is used concerning a person or his affairs which, from its nature, necessarily must, or presumably will, as its natural and proximate consequence, occasion him pecuniary loss, its publication prima facie constitutes a wrong, without any allegation or evidence of damage other than that which is implied or presumed from the fact of publication; and this is all that is meant by the term 'actionable per se'. Therefore, the real practical test, by which to determine whether special damage must be alleged and proved in order to make out a cause of action for defamation, is whether the language is such as necessarily must, or naturally and presumably will,

occasion pecuniary damage to the person of whom it is spoken."

 The defendant contends that the case should have been dismissed at the close of the evidence because the plaintiff failed to prove any actual damages. The position is not well taken. The court takes judicial notice of the injurious character of words actionable per se. They necessarily import damage and need not be pleaded or proved but are conclusively presumed to be injurious. Special damages need not be shown in order to sustain the action. 33 Am. Jur. 40, Sec. 5. Damages for mental suffering are embraced in the recovery of general compensatory damages. 90 A.L.R. 1184.

The general rule is that the victim of a defamation which is actionable per se can recover general damages without proof of loss or injury which is conclusively presumed to result from the defamation. It is only where the defamation is actionable per quod that proof of special damages is required. 33 Am.Jur. 263, Sec. 282; Walker v. Tucker, 220 Ky. 363, 295 S.W. 138, 53 A.L.R. 547. It is not necessary to show actual malice.

The defendant contends that even if the defamatory matter is libelous per se, it is protected by KRS 411.050. This section deals only with a case wherein punitive damages have been awarded. It is admitted that the plaintiff made no request for a retraction and had punitive damages been awarded the argument of the defendant would be proper. Since none were awarded, and upon colloquy between the court and the jury it was stated that none were intended to be awarded, I am unable to see why the defendant presented this argument at all.

 The defendant seriously contends that no malice was shown. That is a question which was submitted to the jury. Whether or not there was actual malice, meaning ill will, or such malice which might be presumed from a reckless disregard of the character and reputation of the plaintiff in accepting as fact and news the irresponsible, vicious statements of notoriously criminal characters,

was a question for the jury. Malice is a state of mind and can only be determined in law by deduction from facts and circumstances. Its determination is peculiarly within the province of the jury.

The same applies to the question of the truth of the charges contained in the broadcast. On the question of truth the defendant is confusing. In the opening statement to the jury it would seem that it was not contending that the statements it broadcast were true. In briefs, on its motion, after verdict, it implies certain of these statements were true and proven to be true by the evidence. All of the statements of any material significance were denied in the allegations in the complaint and by the plaintiff on the witness stand. He denied the import that he was engaged in a common enterprise of fraud, deceit and corruption with criminals and outlaws. At any rate, the question of truth was submitted to the jury under the instructions of the court and it does not seem that the question could now be raised that it was the province of the court to pass upon the truth of the assertions. The jury, by its verdict, decided that the statements, inferences and deductions of the broadcasts were not true and unless the jury reached that conclusion because of misleading and erroneous instructions of the court the verdict must stand.

The defendant further complains that the instructions of the court were erroneous and misleading and that the court should have given certain instructions requested by it.

 It would serve no purpose to review in detail the instructions given in this case and the law on which they were based. In cases of this character instructions to the jury are very difficult and it can well be said that after a conclusion of the case the instructions, upon examination, might be found to be defective in some measure. The real question is whether or not the jury was misled in any way or whether it had an understanding of the issues and its duty to determine those issues. The case was

**112**

fairly tried and the issues squarely presented to the jury. The instructions were taken largely from Stanley's "Instructions to Juries", Chap. 56, which are based upon instructions that have been given or suggested by the courts in Kentucky.

 The question has not been raised so I assume there is no dispute, but I might point out that the dissemination of defamatory remarks by television is libel rather than slander. The record discloses that the remarks were read from a transcript of notes and has been held to be libel. Hartmann v. Winchell, 296 N.Y. 296, 73 N.E.2d 30, 171 A.L.R. 759. See also an article in the "American Bar Association Journal" for February 1957, p. 164, which reviews the case of Shor v. Billingsley, Sup., 158 N.Y.S.2d 476.

The motions of the defendant and each of them should be overruled. An order to that effect is entered as of March 5, 1957.

Appendix

Script of Broadcast for April 12, 1955, over Radio Station WSAZ

A politically explosive storm is brewing in Catlettsburg, Kentucky, and in the center is the young Boyd County Attorney, Calvin Gearhart. Charges against the 33-year-old Gearhart have been brought before the Kentucky State Bar Association in accusing him of having permitted a witness to testify before the grand jury under a false name * * * with full knowledge that it was a false name. The allegation also contends that the witness gave false testimony. The charges were filed in Frankfort April fourth by three Ashland women, Mrs. Dixie Serey, Mrs. Esther Justice, and Mrs. Ruby Bullington. Mrs. Serey's husband—known as Zip—has pleaded guilty to operating a gambling establishment and is expected to begin a six-months jail sentence this week.

Gearhart claims the charges are "absolutely not true" and are part of a plot to remove him from office. He says the Bar Association has advised that he has 20 days to reply to the accusations. The Secretary of the Association—H. H. Harned of Frankfort—declined to comment on the charges. He said that under statutory law, he could not even confirm that the charges had been filed. At the same time, accusations with stronger implications have been fired * * * and little Catlettsburg's rumor mill is going full-blast. A group of prisoners in the county jail—two of whom already have pleaded guilty to robbery and face possibly the next 20 years in prison—contend that Gearhart, along with Boyd Circuit Court Clerk Gerald Lyons and a convicted criminal named Darwin Scott, who is in the federal penitentiary in Atlanta * * * hatched a plot to take over the city rackets * * * shake down the gamblers and bootleggers for a payoff in return for permission to operate. Gearhart strongly denied the allegations today; labeled them ridiculous, pointed out that he did not have such influence, and said his main interest is cleaning up Boyd County. The Boyd grand juries of the past February and April apparently feel he has done an excellent job. The February panel commended Gearhart and his staff for "the concentrated effort toward enforcement of gambling and bootlegging laws." And the April jury, just completed, filed a report indicating "an excellent job is being done by the County Attorney, Calvin Gearhart, and his staff."

The charge before the Bar Association resulted from these circumstances: Through Darwin Scott, Gearhart hired two men who gave their names as Robert Yager and James Russell to investigate gambling and bootlegging in Catlettsburg. Their day was to be underwritten by the county ministerial association. The men furnished Gearhart with identical lists of names and places involved in gambling and bootlegging * * * and testified before the Boyd grand jury last June. Indictments were returned in nearly all cases * * * but when the cases were due for trial in September the attorney for some of the defendants—the late Max Stevenson—turned

up a technical error in the empaneling of the jury and all the indictments were thrown out. Just before the September term of court, Gearhart learned that one of his investigators—Russell—also was known by the name Bill Dalton. The next grand jury convened in December and Dalton gave the identical testimony he contributed in June, once again under the name of Russell. Indictments were returned in all those cases once again. The man known as Yager did not testify. As the grand jury met, Yager was in jail in Ironton, Ohio, picked up in the roundup of a robbery gang which had pulled several jobs in Huntington, Ashland, and Catlettsburg. Yager's name turned out to be Raymond Speed * * * and during the course of his interrogation, told of being hired by Darwin Scott and paid by Gearhart for investigating in Catlettsburg. Furthermore, said Speed, alias Yager, he and Dalton, alias Russell, never had investigated anything. Darwin Scott had told them what to say, and had given them the list of names to present to the grand jury. When Speed's song got out * * * a further investigation revealed that Russell's real name was Dalton, and that Gearhart had written several personal checks to Dalton—under that name—in November and early December, then had allowed him to testify to the December grand jury under the name James Russell. Subsequently, the name charges were brought before the bar association.

Gearhart admitted today that he knew the witness was known by two names, and conceded he might have made a mistake in failing to establish which was correct. But he said he had no reason to doubt the testimony. He said grand jury records will show the testimony was fairly complete * * * and it did not sound like a second-hand story. All the indictments have been disposed of * * and most of those named have pleaded guilty. Gearhart also admits he may have been wrong in hiring Speed and Dalton and in working with Scott—all fellows of the realm whose characters he conceded were not above reproach. But he says "If I had it all to do over again, I might do the same thing." He says he previously hired two bona fide investigators from distant law agencies * * * and their reports resulted in some success in the crackdown on vice. But those investigations were confined to other parts of the county. Gearhart said he knew of no one to check into Catlettsburg's situation. Scott chose that time—only a few weeks before the June grand jury was to convene—to make his pitch. Gearhart says he accepted because Scott's offer became the only means at his disposal. He says Scott told him that the pair already had made their investigations and had lists of places where gambling and bootlegging were in operation.

The county attorney explained his stand this way: "If enforcing the law is a crime, then I'm guilty."

### Script of Broadcast for April 13, 1955, over Radio Station WSAZ

Undercurrents of a political explosion are whirling through Catlettsburg, Kentucky, and in the center is the young Boyd County Attorney, Calvin Gearhart. Charges against the 33-year-old Gearhart have been placed before the Kentucky State Bar Association accusing him of having permitted a witness to testify before the grand jury with full knowledge that the man was using a false name. The allegation also contends that the witness gave false testimony.

The charges were filed in Frankfort, April fourth, by three Ashland women—Mrs. Dixie Serey, Mrs. Esther Justice, and Mrs. Ruby Bullington. Mrs. Serey's husband—largely through Gearhart's efforts—has pleaded guilty to operating a gambling establishment and is expected to begin a six-months jail sentence this week.

Gearhart claims the charges against him are "absolutely not true", and are part of a plot to remove him from office. He was given 20 days by the bar association to reply to the charges.

The two latest Boyd grand juries apparently feel he's done an excellent job.

The April jury, just completed, filed a report stating that "an excellent job is being done by the county attorney, Calvin Gearhart, and his staff". * * *

The charge before the bar association resulted from these circumstances: through Darwin Scott, a convicted criminal and now in the federal penitentiary in Atlanta, Gearhart hired two men who gave their names as Robert Yager and James Russell to investigate gambling and bootlegging in Catlettsburg. The county ministerial association had agreed to underwrite expenses for the cleanup, for instance, the pay these men would receive. The pair furnished identical lists of names and places where unlawful activities allegedly were taking place * * * and testified before the grand jury last June. Indictments were returned in nearly all cases, but when the cases were due for trial in September, the attorney for some of the defendants —the late Max Stevenson—found a technical error in the empaneling of the June grand jury. All the indictments, as a result, were thrown out.

Just before the September term of court, Gearhart learned that one of his investigators—Russell—also was known by the name Bill Dalton. But when the next grand jury convened in December, the man repeated his testimony of June * * * once again under the name of Russel. Again, indictments were returned in all cases. The man known as Yager had not testified as he had in June. As the grand jury met, Yager was in jail in Ironton, Ohio, picked up in the roundup of a robbery gang responsible for several jobs in Huntington, Ashland, and Catlettsburg. Yager's name turned out to be Raymond Speed, and during the course of his interrogation, he told of being hired by Darwin Scott and paid by Gearhart of investigating in Catlettsburg. Furthermore said Speed, alias Yager, he and Dalton, alias Russell, never had investigated anything. Darwin Scott had told them what to say and had given them a list of names to present to the grand jury.

· Speed's confession did not come to Gearhart's attention until after Russell's appearance before the grand jury. As a result of Speed's admissions, Russell became the subject of further investigation. Then it was found his real name was Bill Dalton * * * and that Gearhart had written him several personal checks under that name in November and early December * * * but had allowed him to testify before the December grand jury as Russell. Subsequently, the name charges were filed before the bar association.

Gearhart admits he learned the witness was known by two names * * * and conceded he might have made a mistake in failing to establish which was correct. But he said he had no reason to doubt the testimony. He said the grand jury records will show Russell's testimony was fairly complete, and did not sound second-hand. And he pointed out that other witnesses confirmed some of that testimony before the grand jury. Furthermore, all the indictments resulting from that testimony have been disposed of * * * and most of those named pleaded guilty. Gearhart also points out that when he heard of Speed's repudiation of the investigation, he checked with Dalton. And when Dalton admitted before Gearhart and the Boyd County sheriff that he had made no investigaton, Gearhart had him arrested and charged with perjury and taking money under false pretenses.

Gearhart also admits he may have been wrong to hire Speed and Dalton and to work with Scott—He concedes their characters were not above reproach. But he says, "If I had it all to do over again, I might do the same thing." He previously hired two bona fide investigators from distant law enforcement agencies, and their efforts resulted in some success in his crackdown. But those investigations ended without touching Catlettsburg's rackets. And Gearhart says he knew of nobody else to continue the work there. Scott happened to pick that time —only a few weeks before the June grand jury was due to convene—to make

his patch. And Gearhart says he accepted because Scott's offer became the only means at his disposal to stamp out Catlettsburg's rackets. Gearhart says Scott told him when he broached the offer that Yager and Russell had already made their investigations and had lists of names and places all prepared.

The county attorney explains his stand this way: "If enforcing the law is a crime, then I'm guilty."

More potent accusations come from more dubious sources: The accused perjurer Dalton, alias Russell, and two members of the robbery ring in which Speed, alias Yager, were involved * * * in signed and notarized statements issued from the Boyd County jail, they charge as follows:

According to Dalton, Circuit Court Clerk Gerald Lyons, Calvin Gearhart, and Darwin Scott "hired some men to give false testimony in front of the grand jury * * * to get indictments * * * " so that gamblers and bootleggers "would come to Mr. Gearhart and Mr. Lyons and pay them to forget these indictments." The county attorney answers that such a deal would be impossible because once he secures an indictment, the case leaves his hands and goes to the commonwealth attorney.

Herbert Brubaker, an exconvict who has pleaded guilty to robbery charges and awaits sentence, says that "Gerald Lyons, Darwin Scott, and Calvin Gearhart got the sympathy of the church people, got Catlettsburg voted dry knowing that the city then would not have any revenue to meet its budget. "This would leave the city at their mercy and they could organize the city and also the county by allowing bootlegging, gambling, and bookmaking.

In return, they were to receive one fourth of the returns from bookmaking and gambling, and one dollar per case on whisky."

Gearhart repeats he knows of no deal * * * his interest is cleaning up the county for the sake of having a clean county. He says it's not conceivable that Scott might have been using him in hopes of taking over the city himself * * * because Scott had no reason to believe he'd be able to operate if nobody else could.

Another exconvict, James Statham, who also has pleaded guilty to robbery, says Speed told him "Mr. Gearhart was to start a campaign against bootleggers and gamblers on a pretext of cleaning up Catlettsburg. After the town went dry, their plans were to let gamblers and bootleggers operate only if they paid" to what he called—"The organization of Mr. Gearhart." Speed, it should be pointed out, is under indictment for perjury.

Gearhart says he never saw or heard of Statham until the man's arrest early last December in the robbery gang roundup. He reiterated his denials, calling the whole thing a political move aimed at removing him and Lyons from office so that the rackets could continue to flourish in the county.

In the midst of all this furore, public officials are pointing accusing fingers at one another. And the words deals, payoffs, and corruption are bandied about freely. These accusations stretch across Ashland and Catlettsburg law enforcement agencies. * * *

A blowup is imminent. And unless somebody or some group gets to the bottom through an honest and fearless investigation, little Catlettsburg, indeed all of Boyd County, may find itself with troubles far worse than a city debt.

Script of Telecast for April 12, 1955 over Television Station WSAZ–TV

A politically explosive storm is brewing in Catlettsburg, Kentucky, and in the center is the young Boyd County Attorney, Calvin Gearhart. Charges against the 33-year-old Gearhart have been brought before the Kentucky State Bar Association accusing him of having permitted a witness to testify before the grand jury under a false name * * * with full knowledge that it was a false name. The allegation also contends that the witness gave false testimony. The

charges were filed in Frankfort April fourth by three Ashland women, Mrs. Dixie Serey, Mrs. Esther Justice, and Mrs. Ruby Bullington. Mrs. Serey's husband—known as Zip—has pleaded guilty to operating a gambling establishment and is expected to begin a six-months jail sentence this week.

Gearhart claims the charges are "absolutely not true" and are part of a plot to remove him from office. He says the Bar Association has advised that he has 20 days to reply to the accusations. The Secretary of the Association—H. H. Harned of Frankfort—declined to comment on the charges. He said that under statutory law, he could not even confirm that the charges had been filed. At the same time, accusations with stronger implications have been fired * * * and little Catlettsburg's rumor mill is going full-blast. A group of prisoners in the county jail—two of whom already have pleaded guilty to robbery and face possibly the next 20 years in prison— contend that Gearhart, along with Boyd Circuit Court Clerk Gerald Lyons and a convicted criminal named Darwin Scott, who is in the federal penitentiary in Atlanta * * * hatched a plot to take over the city rackets * * * shake down the gamblers and bootleggers for a payoff in return for permission to operate. Gearhart strongly denied the allegations today, labeled them ridiculous, pointed out that he did not have such influence, and said his main interest is clean-up Boyd County.

Script for Telecast for April 13, 1955, over Television Station WSAZ–TV

Undercurrents of a political explosion are whirling through Catlettsburg, Kentucky, and in the center is the young Boyd County Attorney, Calvin Gearhart. Charges against the 33-year-old Gearhart have been placed before the Kentucky State Bar Association accusing him of having permitted a witness to testify before the grand jury with full knowledge that the man was using a false name. The allegation also contends that the witness gave false testimony.

The charges were filed in Frankfort, April fourth, by three Ashland women— Mrs. Dixie Serey, Mrs. Esther Justice, and Mrs. Ruby Bullington. Mrs. Serey's husband—largely through Gearhart's efforts—has pleaded guilty to operating a gambling establishment and is expected to begin a six-months jail sentence this week.

Gearhart claims the charges against him are "absolutely not true," and are part of a plot to remove him from office. He was given 20 days by the Bar Association to reply to the charges.

The two latest Boyd grand juries apparently feel he's done an excellent job. The April jury, just completed, filed a report stating that "an excellent job is being done by the County Attorney, Calvin Gearhart, and his staff". * * *

The charge before bar association resulted from these circumstances: through Darwin Scott, a convicted criminal and now in the federal penitentiary in Atlanta, Gearhart hired two men who gave their names as Robert Yager and James Russell to investigate gambling and bootlegging in Catlettsburg. The county ministerial association had agreed to underwrite expenses for the cleanup, for instance, the pay these men would receive. The pair furnished identical lists of names and places where unlawful activities allegedly were taking place * * * and testified before the grand jury last June. Indictments were returned in nearly all cases, but when the cases were due for trial in September, the attorney for some of the defendants—the late Max Stevenson—found a technical error in the empaneling of the June grand jury. All the indictments, as a result, were thrown out.

Just before the September term of court, Gearhart learned that one of his investigators—Russell—also was known by the name Bill Dalton. But when the next grand jury convened in December, the man repeated his testimony of June * * * once again under the name of Russell. Again, indictments were returned in all cases. The man known as Yager had not testified as he had in June.

As the grand jury met, Yager was in jail in Ironton, Ohio, picked up in the roundup of a robbery gang responsible for several jobs in Huntington, Ashland, and Catlettsburg. Yager's name turned out to be Raymond Speed, and during the course of his interrogation, he told of being hired by Darwin Scott and paid by Gearhart of investigating in Catlettsburg. Furthermore said Speed, alias Yager, he and Dalton, alias Russell, never had investigated anything. Darwin Scott had told them what to say and had given them a list of names to present to the grand jury.

Speed's confession did not come to Gearhart's attention until after Russell's appearance before the grand jury. As a result of Speed's admissions, Russell became the subject of further investigation. Then it was found his real name was Bill Dalton * * * and that Gearhart had written him several personal checks under that name in November and early December * * * but had allowed him to testify before the December grand jury as Russell. Subsequently, the name charges were filed before the bar association.

Gearhart admits he learned the witness was known by two names * * * and conceded he might have made a mistake in failing to establish which was correct. But he said he had no reason to doubt the testimony. He said the grand jury records will show Russell's testimony was fairly complete, and did not sound second-hand. And he pointed out that other witnesses confirmed some of that testimony before the grand jury. Furthermore, all the indictments resulting from that testimony have been disposed of * * * and most of those named pleaded guilty. Gearhart also points out that when he heard of Speed's repudiation of the investigation, he checked with Dalton. And when Dalton admitted before Gearhart and the Boyd County sheriff that he had made no investigation, Gearhart had him arrested and charged with perjury and taking money under false pretenses.

Gearhart also admits he may have been wrong to hire Speed and Dalton and to work with Scott—he concedes their characters were not above reproach. But he says, "If I had it all to do over again, I might do the same thing." He previously hired two bona fide investigators from distant law enforcement agencies, and their efforts resulted in some success in his crackdown. But those investigations ended without touching Catlettsburg's rackets. And Gearhart says he knew of nobody else to continue the work there. Scott happened to pick that time—only a few weeks before the June grand jury was due to convene—to make his patch. And Gearhart says he accepted because Scott's offer became the only means at his disposal to stamp out Catlettsburg's rackets. Gearhart says Scott told him when he broached the offer that Yager and Russell had already made their investigations and had lists of names and places all prepared.

The county attorney explains his stand this way: "If enforcing the law is a crime, then I'm guilty."

Script of Telecast for April 14, 1955, over Television Station WSAZ–TV

Tonight, we continue the report of developments surrounding disbarment charges against Boyd County, Kentucky Attorney Calvin Gearhart, which have been filed before the Kentucky Bar Association.

As we reported last night, the circumstances involved two men—Raymond Speed alias Robert Yager and William Bill Dalton alias James Russell both of Ironton who were hired by Gearhart to investigate vice conditions in Catlettsburg. The hiring involved a convicted criminal, Darwin Scott now in the Atlanta Federal Penitentiary. Speed and Dalton and two other members of a robbery ring rounded up last spring in Ironton have all implicated Gearhart in more potent accusations. In signed and notarized statements issued by three of them from the Boyd County jail, they charge as follows:

According to Dalton, Circuit Court Clerk Gerald Lyons, Calvin Gearhart, and Darwin Scott "hired some men to give false testimony in front of the grand jury * * * to get indictments * * *." So that gamblers and bootleggers "would come to Mr. Gearhart and Mr. Lyons and pay them to forget these indictments." The County attorney answers that such a deal would be impossible because once he secures an indictment, the case leaves his hands and goes to the commonwealth attorney.

Herbert Brubaker, an exconvict who had pleaded guilty to robbery charges and awaits sentence, says that "Gerald Lyons, Darwin Scott, and Calvin Gearhart got the sympathy of the church people, got Catlettsburg voted dry knowing that the city then would not have any revenue to meet its budget. "This would leave the city at their mercy and they could organize the city and also the county by allowing bootlegging, gambling, and bookmaking.

"In return, they were to receive one fourth of the returns from bookmaking and gambling, and one dollar per case on whisky."

Gearhart repeats he knows of no deal. * * * His interest is cleaning up the county for the sake of having a clean county. He says it's not conceivable that Scott might have been using him in hopes of taking over the city himself because Scott had no reason to believe he'd be able to operate if nobody else could.

Another exconvict, James Statham, who also has pleaded guilty to robbery, says Speed told him "Mr. Gearhart was to start a campaign against Bootleggers and Gamblers on a pretext of cleaning up Catlettsburg. After the town went dry, their plans were to let gamblers and bootleggers operate only if they paid" to what he called—"the organization of Mr. Gearhart." Speed, it should be pointed out, is under indictment for perjury.

Gearhart says he never saw or heard of Statham until the man's arrest early last December in the robbery gang roundup. He reiterated his denials, calling the whole thing a political move aimed at removing him and Lyons from office so that the rackets could continue to flourish in the county.

In the midst of all this furore, public officials are pointing accusing fingers at one another. And the words deals, payoffs, and corruption are bandied about freely. These accusations stretch across Ashland and Catlettsburg law enforcement agencies.

A blowup is imminent. And unless somebody or some group gets to the bottom through an honest and fearless investigation, little Catlettsburg, indeed all of Boyd County, may find itself with troubles far worse than a city debt.